IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-00683-DDD-STV

CANYON CLUB CONDOMINIUM OWNERS
ASSOCIATION,

        Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE
COMPANY, a corporation,

        Defendant.

---

**AMERICAN FAMILY'S RESPONSE TO CANYON CLUB'S COMBINED MOTIONS
FOR PARTIAL SUMMARY JUDGMENT AGAINST AMERICAN FAMILY'S
DEFENSES AND COUNTERCLAIMS (ECF NO. 166)**

---

Defendant American Family Mutual Insurance Company ("American Family") hereby

responds to Plaintiff Canyon Club Condominium Owners Association's ("Plaintiff's") Combined

Motions for Partial Summary Judgment (ECF No. 166) ("Motions") as follows:

## INTRODUCTION

None of Plaintiff's Motions is supported by the facts of the case or principles of Colorado

insurance law. This case arises from a fact-intensive record created during the underlying

adjustment and the pending litigation. Disputed issues of fact abound regarding whether Plaintiff

violated its duties and obligations under its policy. There are sufficient facts for a rational jury to

determine Plaintiff violated its policy, vitiating coverage.

Plaintiff's first motion fails because the conduct of Plaintiff and its agent raise multiple,

unresolved questions of fact regarding whether Plaintiff concealed and misrepresented material

facts and failed to cooperate with American Family. Contrary to Plaintiff's contentions, there exist numerous disputed facts from which a reasonable jury could conclude Plaintiff made material misrepresentations in violation of the Policy's Anti-Misrepresentation Clause, including Plaintiff's signature on the sworn statement of loss attesting its accuracy and further including the reconstruction of Building 14. Also, factual issues remain about Impact's agency role, Plaintiff's argument regarding waiver, and the actionable nature of Impact's estimate.

Plaintiff's second motion raises a straw man. American Family has <u>not</u> pled a "reverse bad faith" tort claim. It has pled that Plaintiff breached the policy by violating its implied covenant of good faith and fair dealing—a contractual obligation imposed under Colorado law. Colorado insurance cases, including *Soicher v. State Farm Mutual Automobile Insurance Co.*, 2015 COA 46, ¶ 24, explicitly recognize this contractual duty.

Plaintiff's third motion has no basis in law. As recognized in numerous cases, recoupment/reimbursement is not just a defense but the basis of an insurer's counterclaim. Plaintiff fails to inform the Court about any of this on-point caselaw.

Finally, as to the fourth motion, Plaintiff is mistaken that American Family's first claim for declaratory judgment is duplicative as it is based on Plaintiff's violation of the Full Compliance Clause and seeks a declaration that the suit cannot proceed. American Family consents to the dismissal of its second declaratory judgment claim without prejudice provided it can pursue the substance of the claim through its second and third affirmative defenses.

In sum, Plaintiff's first motion raises arguments that are replete with issues of material fact, and its remaining motions are legally deficient, based on either a misreading of American Family's complaint or a misunderstanding of the salient law. All four motions should be denied.

2

## RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Admitted.

2.     Admitted.

3.     American Family admits the Policy's declarations identify Plaintiff as the named insured. (ECF 1-7, p. 7.) American Family denies any implication that an agent of the insured would not qualify as "you" or "your" as discussed below. American Family also admits its adjuster responded to a demand for appraisal by seeking the demand from Plaintiff directly (ECF 166-3, p. 1, ¶ 2), but denies that it represented an enforcement of the definition of "you" by American Family.

4.     American Family admits that Impact Claim Services ("Impact") is not listed as a Named Insured and is not an insured under the Policy. American Family denies that this fact is relevant.

5.     American Family admits that the quoted portions are correctly quoted.

6.     American Family admits that the quoted portions are correctly quoted.

7.     Denied. ECF 87 alleges that the proof of loss signed by Plaintiff's board president and submitted in July 2017 ("POL") was improperly inflated and misrepresented the cost of repairs. The POL included an attestation that it and any attachments were from the signor and the information is true and correct. (ECF 87, ¶¶ 85-96; ECF 165-4.) ECF 87 further alleges that Project X included a bloated scope of work and grossly inflated costs, including items added at Plaintiff's sole request. (ECF 87, ¶¶ 305-316, 385-397.)

8.     American Family admits that the quoted language was included in a December 19, 2016 letter from Ken Null, an American Family adjuster.

3

9.      Admitted.

10.     American Family admits that a July 7, 2017 letter submitted with the POL represented that the provided estimate was "grossly deficient to the realities and actual costs of the necessary construction and will be amended upon obtaining additional information" and that it represented "an initial projected and minimum scope of repairs and amount of loss." (ECF 166-8, p.2.) (emphases added).

11.     American Family admits that Plaintiff manipulated and altered the POL to read "Initial, Estimated and Partial SWORN STATEMENT OF LOSS." (ECF 166-9.)

12.     American Family admits that Impact included in its estimate repeated representations that its scope and costs were grossly deficient and will be amended. American Family further admits that the language quoted is quoted correctly. (ECF 166-10, p. 4.)

13.     Admitted.

14.     Admitted.

15.     Admitted that the language from Mr. Logan's report is correctly quoted.

16.     Admitted.

17.     American Family admits that it did not assert violation of the Ant-Misrepresentation Clause directly in its March 5, 2018 letter but reserved its right to invoke other policy provisions which may affect coverage. (ECF 166-5, p. 5.) American Family admits that it received the Logan report on or about January 30, 2018 and reviewed it before March 5, 2018. American Family admits that the March 5, 2018 letter is correctly quoted.

18.     American Family admits that the quoted testimony is accurately quoted.

19.     Admitted.

20.      American Family admits that it sent a letter on February 13, 2020 seeking an updated proof of loss. American Family denies the characterization that this action constituted a "resumption" of claim adjustment.

21.      Denied.

**STATEMENT OF ADDITIONAL DISPUTED FACTS ("SADF")**

**A.      The Policy**

1.      American Family issued a policy to Plaintiff for April 1, 2016 until April 1, 2017 ("Policy"). (ECF 165-1, p. 7 of 110; ECF 89, ¶ 1.)

2.      The Policy insures 41 buildings for a total insurance limit of $22,202,591. (ECF 165-1, p. 19 of 110.)

3.      The Policy contains exclusions for loss or damage caused by or resulting from, among other things: wear and tear, continuous or repeated seepage or leakage of water, including presence of water vapor, and faulty, inadequate or defective workmanship, repair, or construction. (*Id.*, pp. 43-44 of 110; ECF 89, ¶ 16.)

4.      The Policy includes a duty in the event of loss that the insured must "cooperate with [American Family] in the investigation or settlement of the claim." (ECF 165-1, p. 45 of 110; ECF 89, ¶ 17.)

5.      The Policy also provides, "No one may bring a legal action against [American Family] under this insurance unless: a. There has been full compliance with all of the terms of this insurance." (ECF 165-1, p. 46 of 110.)

6.      The Policy contains an "Anti-Misrepresentation Clause" which provides that American Family "will not pay for any loss or damage in any case of: 1. Concealment or

misrepresentation of a material fact; or 2. Fraud committed by you or any other insured at any time and relating to coverage under this policy." (*Id.*, p. 92 of 110; ECF 89, ¶ 19.)

### B.     Plaintiff's 2012-2013 Roof Replacement

7.     In 2012 through 2013, Plaintiff paid Mountain States Home Improvement to remove existing wood shake shingles from its roofs and replace them with asphalt shingles. The 2012-2013 roofing project also included cutting ridge vents into the roofs. (Ex. A, Contract – Proposal, MOUNTAINSTATES_000050; Ex. B, 2018 Plaintiff 30(b)(6) Dep. 102:19-103:13, 124:18-125:22; ECF 89, ¶ 23.)

8.     The cost of the 2012-2013 roof replacement was $751,784.53. (ECF 162-6; Ex. B, 2018 Plaintiff 30(b)(6) Dep. 138:20-139:11; ECF 89, ¶ 24.)

9.     At the time of the roof replacement, Mountain States informed Plaintiff that soffit vents would need to be cut into the buildings to allow sufficient ventilation, as Mountain States would not perform that work. (Ex. C, Thomas Dep., 80:17-81:13.)

10.     Additionally, during the 2012-2013 roof replacement, 52 sheets of decking were replaced due to delamination caused by moisture. (ECF 162-6; ECF 89, ¶¶ 25-26.) Plaintiff's maintenance staff was aware of, and approved, the replacement of the decking sheets. (Ex. D, Johnson Dep., 33:5-34:7; Ex. E, Blake Dep., 28:8-17; 126:2-127:9.)

11.     Following the roof replacement, the ventilation continued to be non-compliant and the roof assemblies contained only sporadic individual soffit intake vents. The buildings lacked sufficient ventilation to remove moisture from the air in the roof assembly. (ECF 162-4, AAG Canyon_006707; Ex. F, 2020 AAG Report, pp. 61, 69-70.)

**C.    Plaintiff Engages Public Adjuster, Impact, to Represent It in the Claim**

12.    Hail impacted Plaintiff's property on July 15, 2016 ("Storm"). (Ex. G, Public Adjuster Contract, p. 1.)

13.    Plaintiff entered into a public adjuster contract with Impact in October 2016 ("PA Contract") for assistance in pursuing an insurance claim for damages arising from the Storm ("Claim"). (*Id.*, p. 7.) The PA Contract provides Plaintiff shall pay Impact a ten-percent fee on any funds paid by American Family. (*Id.*, p. 3.)

14.    The PA Contract describes the Consultant's (i.e. Impact's) services as follows: "preparation and presentation of the Claim; documentation of the damages and losses, coordinating and communicating with necessary experts or professionals for preparation of such documentation, presentation of any required claim form of 'Sworn Statement in Proof of Loss,' and any other measures deemed necessary by Consultant to settle or otherwise resolve the Claim on behalf of the Insured." (*Id.*, p. 3.)

15.    American Family received notice of the Claim via letter dated October 16, 2016 from Impact. The letter stated, "I respectfully request that all claim matters and communications be directed to members of Impact Claims Services, LLC so we can assist you as promptly as is possible. We trust that you will fully respect all aspects of our **client/agent relationship** with the Insured(s) without interference." (Ex. H, AFMIC_000546 (emphasis added).)

**D.    American Family Adjusts the Claim and Makes a Payment**

16.    In early November 2016, American Family inspected Plaintiff's property and estimated for observed damages, including replacement of the roof shingles on all buildings. (Ex. I, Walters Dep. 41:10-13; *see e.g.*, Ex. J, p. 6, ¶¶ 1-3.)

17.     On November 14, 2016, American Family paid actual cash value of $727,649.18 to Plaintiff and Impact. (ECF 165-2, p. 2, ECF 89, ¶ 54.)

18.     Contemporaneously, American Family provided Plaintiff with the repair estimates used to determine costs. The estimates contained this required, bolded warning: "It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include . . . denial of insurance and civil damages." (*See, e.g.*, Ex. K, p. 5; Ex. J, p. 5.)

19.     Plaintiff objected to American Family's November 2016 payment and supporting estimates. (Ex. L.) American Family replied, including a reservation of rights ("ROR") that American Family's conduct shall not be construed "as waiving any … rights and defenses," including the right to deny coverage. (ECF 166-7 p. 3 ¶ 16 *ff.*)

**E.     Plaintiff Submits an Inflated Sworn Proof of Loss**

20.     On or about July 7, 2017, American Family received the POL from Plaintiff representing $7,927,782.96 in claimed losses. (ECF 165-4.)

21.     The POL was part of a claim presentation, authored by Impact, that enclosed a scope of work and estimate for repairs to all buildings ("Impact Estimate"). (Ex. M, Claim Presentation Table of Contents, p. 2, item I.)

22.     As part of the POL's attestations, its signatory, Plaintiff's board president Lofton Petty, swore that he had read and completed the Sworn Statement in Proof of Loss, including any attachments, and that the information given was true and correct. The attachments included the Impact Estimate. (ECF 165-4.)

8

23.    Mr. Petty testified that he understood he was swearing that he read and completed the POL and attachments, that the information in them was true and correct, and that the POL cautioned that furnishing false information could result in the denial of Plaintiff's Claim. He confirmed that he knew this information at the time he signed the POL. (Ex. AA, Plaintiff 30(b)(6) Dep. 168:9-20.)

24.    American Family's independent experts have identified numerous misrepresentations in the Impact Estimate. (E.g., Ex. F, 2020 Logan Expert Report, p. 62, 1st paragraph (opining Impact misrepresented need to install vented decking), p. 101 (opining Impact misrepresented applicable building codes), p. 122 (opining Impact misrepresented soffit vent work to be performed); Ex. N, 2020 Stevens Expert Report, p. 5, 2d paragraph and pp. 5-45 (opining on $5.9 million in estimate overages in Impact Estimate; s*ee* ECF 87, ¶¶ 85-265.)

25.    For example, the Impact Estimate included over $1.1 million in cost overages to replace the roofing system and install the proposed vented nailable deck, including by misapplication of Xactimate's high-roof charge, installing the unnecessary vented deck, replacing flashing which did not require replacement, and overcharging for rafter replacement in an amount in excess of $240,000. (Ex. F, pp. 14-22, 45; ECF 162-1, pp. 12-14 of 66.)

26.    As American Family has detailed in its own motions for summary judgment, ventilation is not a covered loss. (ECF 162.) However, even if it were, the proposed vented deck would cause unwarranted impacts, including modifications to other building components due to increased height, additional insulation required for the product, and additional weight requiring structural modifications. (Ex. F, pp. 86-87.) There are alternative, cost-effective methods of repairing Plaintiff's deficient ventilation. (*Id.*, pp. 107-112.)

27.     The Impact Estimate also includes excessive safety costs, including $35,000 for renting fall protection harnesses, which are typically owned by roofers and are not a cost passed to the property owner. (ECF 162-1, pp. 15-16 of 66; Ex. N, pp. 8-9.) The Impact Estimate also included excessive amounts of temporary fencing that are not the standard in the construction industry. (ECF 162-1, pp. 9-10 of 66; Ex. N, pp. 9-10.)

28.     The Impact Estimate also includes costs to replace stucco soffits on 40 of the 41 buildings at the property, including 14 buildings which have wood soffits. (Ex. F, pp. 157-160.)

29.     These line items are some of many in the Impact Estimate which misrepresent the costs of repairs to the property. (*See* ECF 87, ¶¶ 85-265.)

30.     Plaintiff's POL incorporates these and all other misrepresentations contained in the Impact Estimate and are sworn by Plaintiff to be true and accurate. (ECF 165-4; Ex. M, p. 2, items I. and V.)

31.     The POL attached a 2017 engineering report from SBSA. (Ex. M, p. 2, item IV.)

32.     SBSA's 2017 report document indicia of accumulated interior moisture within the roof assemblies below the shingles, and opined that the ventilation installed was less than required by building code and was inadequate. The report also documents that SBSA inspected the roof covering for possible sources of water penetration and found none. (ECF 162-4, AAG Canyon_6667, 6684, 6707.)

**F.      Plaintiff Demands Appraisal, and American Family Issues Second Claim Payment**

33.     In October 2017, Impact issued a letter to American Family demanding appraisal on behalf of Plaintiff. (ECF 166-2.)

34.    By letter dated October 10, 2017, American Family questioned whether Impact could initiate appraisal as a public adjuster. (ECF 166-3.)

35.    Impact responded on November 1, 2017, asserting "we provided American Family with … a copy of the Agreement between the Insured and Impact Claim Services ("ICS"), which creates authority for ICS to make this demand for appraisal on behalf of the Insured, among other authority." (Ex. O.)

36.    Following receipt of the Impact Estimate, American Family engaged architect, AAG, to assist with adjusting the Claim. (ECF 166-1, Larsen Dep. 65:3-7.)

37.    On January 31, 2018, AAG provided a report advising that the Impact Estimate was unreasonably inflated and did not accurately reflect the scope of work needed to repair hail-caused damage at the property. (Ex. P, 2018 AAG Report, pp. 1, 24, 56-64, 67-68, 72.)

38.    Based on the opinion of AAG and a retained consulting contractor, AGS, American Family paid an additional $1,078,399.24 in actual cash value in March 2018. (ECF 165-2, at pp. 1 and 3.)

39.    American Family made the March 2018 payment under the same above-described bolded anti-fraud warning (ECF 166-4, p. 2) and under another express reservation of rights. (ECF 166-5, p. 5.)

**G.    Plaintiff Files the Lawsuit and Engages in Inflated Construction Project**

40.    Plaintiff filed this lawsuit on January 30, 2018. (ECF 3.)

41.    In May 2018, Plaintiff's Rule 26(a)(1) initial disclosures incorporated its POL as litigation damages. (ECF 163-5, p. 4 of 6.)

42.     In April 2019, American Family asserted its counterclaims based on Plaintiff's submission of the POL. (ECF 51, pp. 26-53; now found at ECF 87, pp. 18-84.) The counterclaims included allegations that the Impact Estimate and POL were inflated with excessive scope, including the ventilation line items. (ECF 87, ¶¶ 85-265.)

43.     During the litigation, on or about October 18, 2018, Plaintiff entered into an Agreement for Construction Services with Reconstruction Experts, Inc. ("RE"). Mr. Petty signed the agreement for Plaintiff. (Ex. Q.)

44.     RE was engaged to reconstruct one "exemplar", single-story, two-unit building, allegedly to determine the appropriate costs associated with Storm-caused repair work ("Project X"). (ECF 89, ¶¶ 357, 359; Ex. AA, 144:19-24.)

45.     Project X entailed, among other things, replacing shingles, removing and replacing sheathing, installing a vented deck system, and retrofitting the rafters to accommodate the increased weight of the vented decks. (Ex. R, RE June 2019 Proposal, items 2.1, 3.1; Ex. S, RE Repairs Chart, lines 35-41; 60-68.)  Much of the scope of Project X, including the ventilation and rafter modification, was in accordance with the scope of work originally estimated by Impact and the subject of American Family's counterclaim allegations. (*Cf.* Ex. R; Ex. T, Impact Building 14 Estimate; ECF 87 ¶¶ 112-265.)

46.     Plaintiff informed American Family that it would use Project X to establish its repair costs for the entire Property. (ECF 71, ¶ 9.)

47.     RE estimated the cost of Project X based on the scope of work provided by SBSA and Impact, and supervised the work. (Ex. R, p. 2, line 1; Ex. U, 6.18.2020 Yoest Dep. 35:10-36:6, 122:3-124:21; Ex. AA, 145:12-16.)

48.    In June 2019, RE estimated Project X would cost $357,349.41. (Ex. R.)

49.    RE began reconstruction in August 2019. (ECF 89, ¶ 357.)

50.    The scope of work for Project X continually increased as the project moved forward. Several such increases were requested by Plaintiff itself. (*See* SADF ¶¶ 51-58.)

51.    RE contractor Jacob Marshall testified that he only took direction regarding the work to be performed during Project X from Plaintiff directly. He affirmed that he did not take direction from anyone except Plaintiff. (Ex. V, Marshall Dep., 110:10-112:14.)

52.    Mr. Marshall confirmed there were at least two items incorporated into Project X, the replacement of soffits and painting the east side of the building, included at the request of Plaintiff alone, as indicated by the signature of Mr. Petty on the change estimates. (Ex. V Marshall Dep. 213:20-214:21; Ex. W; Ex. X.)

53.    Change Estimate No. 10 shows Plaintiff requested that RE replace the exterior soffits for a cost of $12,814.86. (Ex. W.)

54.    Change Estimate No. 11 shows Plaintiff requested that RE repaint the east elevation for a cost of $1,257.75. (Ex. X.)

55.    Neither replacing the soffits nor repainting the east elevation were included by SBSA as necessary to repair the damage purportedly caused by hail. (*See* Ex. R, *passim*.)

56.    On January 16, 2020, Plaintiff executed an Application For Payment showing the total cost of Project X as $523,198.56. The cost in the Application for Payment includes Change Estimates 10 and 11. (ECF 163-6.)

57.    Mr. Petty testified that, during summertime 2020, units similar to those in Building 14 were selling for about $298,000. (Ex. AA, 30(b)(6) Dep. 81:10-23.)

58. Plaintiff disclosed the Application for Payment to American Family on February 11, 2020. (ECF 75, ¶ 19.)

**H.      American Family Seeks Updated Proof of Loss**

59. On February 13, 2020, American Family asked Plaintiff to clarify the Claim by providing an updated Proof of Loss within 60 days, as the Policy required. (ECF 165-6, "Requested POL").

60. Plaintiff did not provide the Requested POL. Instead, in April 2020 it amended its Complaint to add its Fourth Claim for Relief, asserting Plaintiff was no longer obligated to comply with the Policy. (*See* ECF 86, pp. 16-19.)

61. In May 2020, American Family denied the Fourth Claim's material allegations and supplemented its Counterclaims with allegations relating to Project X and Plaintiff's failure to provide the Requested POL. (ECF 87, pp. 8-80.)

62. Michael Barclay of RE, an expert retained by Plaintiff, opined in his report that $523,198.56 was the necessary cost to repair the damage caused by hail to Building 14. This amount includes Change Estimates 10 and 11. (ECF 163-7, p. 4, ¶ 2, *cf.* ECF 163-6 (showing cost included change orders).)

63. In August 2020, through Mr. Barclay's report Plaintiff asserted $19.35 million in Hailstorm repair costs for the entire Property. (ECF 163-7, p. 4 ($18.83 million plus $523,000).)

64. American Family's independent cost construction expert has opined that the entire property can be rebuilt, from the ground up, for less than $8.2 million (ECF 162-1, p. 13 of 66.)

65. Plaintiff disclosed Derek O'Driscoll of Impact as a non-retained expert to opine that the Impact Estimate reflects reasonable use of Xactimate software to create "an initial

estimate of the amount necessary for repair or replacement of the covered loss in order to adjust

the loss and claim…and to establish an initial potential replacement cost value amount and an

initial cash value amount." (Ex. Y, Supplemental Expert Disclosures, p. 4.)

**RESPONSE BRIEF**

II.    **RESPONSE TO MOTION 1: NUMEROUS ISSUES OF DISPUTED FACT
PRECLUDE SUMMARY JUDGMENT REGARDING PLAINTIFF'S
VIOLATION OF THE POLICY'S COOPERATION AND ANTI-
MISREPRESENTATION CLAUSES**

Plaintiff's First Motion for Summary Judgment seeks dismissal of American Family's

third counterclaim, which asserts that Plaintiff breached the Policy when it violated the Policy's

Anti-Misrepresentation Clause and Cooperation Clause. American Family alleges violation

through actions of Plaintiff and its agents, discussed in detail below. The record facts do not

support dismissal of American Family's third counterclaim.

A.    **Plaintiff Committed Misrepresentations Through its Actions and the Actions
of its Agent, Impact**

Plaintiff argues that American Family must prove that Plaintiff itself violated the Anti-

Misrepresentation Clause and cannot do so. This argument should be rejected for two reasons.

First, there is abundant evidence that Plaintiff itself made material misrepresentations of the

scope and cost of repairs. Second, Impact, acting as Plaintiff's agent, misrepresented facts

regarding coverage required and the cost of repairs.

1.    **Plaintiff Itself Violated the Policy's Misrepresentation Clause in
Multiple Ways**

"To establish fraud arising from the violation of a fraud clause, an insurer must prove

three elements: (1) that the insured misrepresented or omitted some fact; (2) that the

misrepresentation or omission was 'material;' and (3) that there was 'intent to deceive on the part

15

of the insured.'" *Benson v. Allstate Fire & Cas. Ins. Co.*, No. 17-cv-00866-KMT, 2020 WL 227829, at *2 (D. Colo. Jan. 15, 2020) (quoting *Sunflower Condo. Ass'n, Inc. v. Owners Ins. Co.*, No. 16-CV-2946-WJM-NYW, 2018 WL 2196089, at *3 (D. Colo. May 14, 2018)). So long as Plaintiff's misrepresentations were made knowingly and deliberately, the intent to deceive the insurer will be implied. *Sunflower*, 2018 WL 2196089, at *5 (quoting *Wagnon v. State Farm Fire & Cas. Co.*, 146 F.3d 764, 771 (10th Cir. 1998). Here, there is ample evidence that Plaintiff knew it was misrepresenting the extent and cost of repairs required and that it misrepresented those material facts with intent to deceive.

First, Mr. Petty signed the POL, which included attestations that its signatory read and completed it and any attachments and that the information given was true and correct. (SADF ¶ 22.) Mr. Petty testified that he knew and understood the attestations at the time he signed the POL. (*Id.* ¶ 23.) As such, Mr. Petty swore he reviewed the Impact Estimate and that the represented $8 million in necessary costs to repair hail damage was true and accurate. (*Id.* ¶¶ 20-21.) Plaintiff had a basis to know the appropriate cost for roof replacement as a result of the 2012-2013 work by Mountain States, when replacement of all shingles and some decking cost approximately $750,000[1]. (*Id.* ¶¶ 7-8.) A rational jury could find that Plaintiff would have known the cost of roof replacement would not increase that extensively in five years. In signing the POL, the insured knowingly misrepresented a material fact regarding its insurance.

---

[1] Impact's estimate and the POL include some non-roofing scope that was not part of the 2012-2013 roof replacement, such as windows and siding. American Family's expert, Gary Stevens, performed an assessment of the roofing costs found in the Impact Estimate compared with the costs of the 2012-2013 project adjusted for inflation and found a $2,750,000 difference. (Ex. Z.)

Project X compounded the misrepresentations made by Plaintiff itself. Through Project X, Plaintiff engaged RE to reconstruct a building, including installing a vented deck. (*Id.* ¶¶ 43-45.) Plaintiff signed numerous change orders that further increased the costs of repairs. (*Id.* ¶¶ 47-48, 56.) Change Estimate 10 charged to replace soffits at Plaintiff's request, signed by Mr. Petty. (*Id.* ¶ 53.) Change Estimate 11 included costs to repaint the east elevation of the building also at Plaintiff's request. (*Id.* ¶ 54.) The cost of these change orders was incorporated into the Application for Payment and has been subsequently represented by RE to be necessary costs for repairing hail damage. (*Id.* ¶¶ 55-57, 62.) Additionally, RE's representative testified that he only took direction regarding the work performed on Project X from Plaintiff directly. (*Id.* ¶¶ 51-52.) The scope of repairs included numerous items, such as the vented decks and re-sistered joists, which American Family's Counterclaims already had alleged were inflated and unnecessary. (*Id.* ¶ 45.) Plaintiff had reason to know that Project X misrepresented the costs of hail damage repairs.

Mr. Petty demonstrated, in his deposition, that he knew the cost of reroofing the two-unit complex would nearly equal the market value of the units themselves. He testified that a unit similar to those in Building 14 contemporaneously sold for $298,000, while the entire re-roofing budget for the two units together was $523,000. (*Id.* ¶¶ 56-57.) A jury could reasonably conclude that Plaintiff should have known that the value of repairing hail damage should not nearly equal the entire sale value of the property itself. Indeed, the total estimate submitted in Plaintiff's expert disclosures, $19.35 Million, nearly matches the total insured value of the property: $22 Million. (*Id.* ¶¶ 2, 63.) American Family's cost construction expert opined the entire complex could be rebuilt for less than $8.2 million. (*Id.* ¶ 64.)

17

Additionally, Plaintiff was aware that the 2012-2013 re-roofing project resulted in faulty ventilation. Its roofer, Mountain States, informed the board before the re-roofing that it would not install soffit vents, but that such vents would need to be added. (*Id.* ¶ 9.) Plaintiff was also aware of moisture damage to its decking even before the roofs were replaced. (*Id.* ¶ 10.) Further, Plaintiff's POL included the 2017 SBSA report that clearly stated the buildings' interior moisture problems were caused by poor ventilation and that there were no visible indications of external water intrusion. (*Id.* ¶¶ 31-32.) Thus, a reasonable jury could find that Plaintiff was well aware of the likelihood of ventilation problems at the property substantially before the Storm, and that Plaintiff knew that the moisture problems evident after the Storm were a result of that faulty ventilation rather than hail. As a result, the jury could determine that Plaintiff misrepresented or omitted information when it represented to its insurer that the cost of repairing the defectively installed ventilation fell within the coverage of an insurance claim. *See Wheatridge Office, LLC v. Auto-Owners Ins. Co.*, 578 F. Supp. 3d 1187, 1203 (D. Colo. 2022) (finding disputed issues of fact prevented summary judgment on breach of contract claims based on violation of anti-misrepresentation and cooperation clauses where the insurer alleged, among other things, that the insured had submitted an inflated estimate for repairs).

> **2.      The Actions of Plaintiff's Public Adjuster Are Imputed to Plaintiff as Its Agent**

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Stortroen v. Beneficial Fin. Co. of Colo.*, 736 P.2d 391, 395 (Colo. 1987). "An agency relationship need not be contractual, and 'may exist even though the parties do not call it an agency and do not subjectively intend that legal consequences flow from their

relation.'" *Mullin v. Hyatt Residential Grp., Inc.*, 82 F.Supp.3d 1248, 1258 (D. Colo. 2015)
(quoting *Stortroen*, 736 P.2d at 395). The existence of an agency relationship is usually a
question of fact. *Id*. While American Family believes that the Court could find Impact and
O'Driscoll were agents of Plaintiff as a matter of law, such a finding is not necessary here. To
defeat this component of Plaintiff's Motion, the Court need only find disputed issues of fact exist
regarding whether Impact acted as Plaintiff's agent.

Plaintiff and Impact entered into the PA Contract which stated Impact would, among
other responsibilities, prepare and present the Claim, coordinate and communicate with
necessary experts, complete the presentation of a Sworn Statement in Proof of Loss "and any
other measures deemed necessary by [Impact] to settle or otherwise resolve the Claim on behalf
of the Insured." (SADF ¶¶ 13-14.) Additionally, Impact insisted that all communications from
American Family regarding the Claim should be transmitted to Impact and Impact expressly
stated that it had a "**client/agent relationship**" with Plaintiff. (*Id.* ¶ 15.) Impact was also
principally responsible for coordinating site inspections, instructing Plaintiff's experts (including
SBSA), and coordinating access to the property for its experts and American Family's
representatives. From these facts, taken together, a rational jury could reasonably conclude that
Impact and Plaintiff had an agency relationship.

Plaintiff asserts that in one instance American Family did not interpret the term "insured"
within the Policy to include Impact at the time of an appraisal demand. Even if true, this fact is
immaterial. First, Colorado courts have found that the actions of an agent can breach the Anti-
Misrepresentation Clause and vitiate coverage. *See Republic Ins. Co. v. Jernigan*, 753 P.2d 229,
231 (Colo. 1988) (considering whether the insured, through its agent, breached an anti-

19

misrepresentation clause); *see also Dyer v. Johnson*, 757 P.2d 178, 180 (Colo. App. 1988) (finding that a principal may be bound by "the false representations of his agent made without his knowledge, consent, or authority . . . if an agent has apparent authority to make a representation."). In *American Diver's Supply v. Boltz*, the fraud clause prohibited misrepresentations by "the insured" but the court determined the clause was violated because "the record is replete with evidence that insured's **employees and agents** deliberately and intentionally concealed and misrepresented material matters" regarding the claim. 482 F.2d 795, 798 (10th Cir. 1973) (emphasis added). A single instance of American Family insisting that Plaintiff itself sign a document does not vitiate the principle that Plaintiff is bound by the actions of its agent.

Second, the question of whether Impact is an agent of Plaintiff cannot be answered or modified by American Family. The existence of agency turns on the intention of the parties to the relationship as evidenced by their actions. *Citywide Banks v. Armijo*, 313 P.3d 647, 651 (Colo. App. 2011). American Family is not a party to the agreement between Plaintiff and Impact and so American Family's actions have no impact on the existence of an agency relationship.

The actions of Impact, set forth in American Family's counterclaims, establish a basis on which the jury could find that both Impact and Plaintiff itself misrepresented material facts about the Claim, including misrepresenting the scope of work and costs required to repair hail damage. Summary judgment is therefore unwarranted.

B.    **American Family Has Not Waived Plaintiff's Fraud or Failure to Submit a Proof of Loss**

Plaintiff also contends that, through conduct, American Family has impliedly waived (1) Plaintiff's breach of the Anti-Misrepresentation Clause, and (2) Plaintiff's failure to submit the 2020 Requested POL. Both contentions fail.

### 1.    The Policy Disallows Waiver by Conduct

In *Domokos v. Shelter Mut. Ins.*, 416 F. Supp. 3d 1209 (D. Colo. 2019), the insured argued that the insurer's conduct impliedly waived the insurer's right to deny coverage. The court rejected that argument, because the insurance policy stated that "[t]he provisions of this policy may be … waived only by written agreement signed by us." *Id*. at 1230-31.

The Policy here similarly states that its "terms can be waived only by endorsement issued by us and made a part of this policy." (ECF 165-1, p. 64.) An endorsement is a written document. Therefore there can be no waiver by conduct here.

### 2.    American Family's Payments Did Not Impliedly Waive Fraud

Plaintiff argues that American Family waived Plaintiff's submission of its fraudulently inflated claim because American Family made payments on that claim in November 2016 and March 2018. Motion, pp. 15-16.

"Under Colorado law, waiver is the intentional relinquishment of a known right." *Copper Oaks Master Home Owners Ass'n v. Am. Fam. Mut. Ins. Co.*, 2018 WL 3536324, at *16 (D. Colo. Jul. 23, 2018). Waiver may be express or implied. *Id*. For waiver to be implied from conduct, "the conduct must be free from ambiguity and clearly manifest the intent not to assert the benefit." *Id. Accord Great N. Ins. Co. v. 100 Park Ave. Home Owners Ass'n, Inc.*, 2021 WL 2660778, at *2 n. 2 (D. Colo. June 29, 2021). "[T]here must be a clear, unequivocal, and decisive

21

act by the party against whom waiver is asserted." *Owners Ins. Co. v. Dakota Station II Condo.*

*Ass'n, Inc.*, 2021 COA 114, ¶ 25 (inner quotation marks and citation omitted).

> a.    American Family's Anti-Fraud Warnings and RORs demonstrate
>       Lack of Intent to Waive

American Family provided RORs and anti-fraud warnings which demonstrate no intent to

waive. (SADF ¶¶ 18-19, 39.) An ROR allows an insurer to pay policy benefits but later "claw

back" the payments. *Cribari v. Allstate Fire & Cas. Ins. Co.*, 861 F. Appx. 693, 701-02 (10th

Cir. 2021). American Family's RORs thus show its intent to preserve the right to claw back later.

Moreover, the anti-fraud warnings included in American Family's estimates and payment letters

advised Plaintiff (in bold) that fraud by an insured carries "penalties" including "denial of

insurance and civil damages." In Colorado, the "penalty" is denial of insurance benefits for the

entire claim; and the civil damages are any benefits the insurer previously paid (plus interest).

*See e.g.*, *Boltz*, 482 F.2d at 797-98.

Waiver is the <u>intentional</u> relinquishment of a known right. There can be no waiver

without intent to waive. American Family's RORs and anti-fraud warnings demonstrate it did not

intend to waive Plaintiff's fraud via payment of benefits. At a minimum, the ROR and warnings

establish a genuine issue of material fact whether American Family intended to waive.

> b.    Until August 2020, American Family Lacked Information it
>       Needed to Waive

Because a waiver must be "known," any waiver (express or implied) "<u>requires full</u>

<u>knowledge of all the relevant facts</u>." *Copper Oaks,* 2018 WL 3536324, at *16 (emphasis added).

*Accord*, *100 Park*, at *2 n. 2 (quoting *Copper Oaks*). Waiver cannot occur if the party "lacked

full information" relevant to the right at issue and the decision to waive it. *Copper Oaks*, 2018

22

WL 3536324, at *17 (rejecting waiver argument because insurer lacked the full information it needed to waive).

In November 2016, American Family lacked knowledge of Plaintiff's fraud because Plaintiff's inflated POL was not submitted until July 2017. (SADF, ¶¶ 20, 22, 24.) Moreover, Plaintiff's fraud continued and grew until August 2020, when Plaintiff doubled-down on Project X and its Claim ballooned to $19.35 million. (SADF, ¶¶ 40-58.) American Family therefore lacked full information about Plaintiff's fraud when it made the March 2018 payment too, and again could not have waived it. At a minimum, whether and when American Family had full knowledge of all relevant facts raises genuine disputes of material fact. *See 100 Park,* at *2 (denying insured's motion for summary judgment on waiver).

### 3. American Family's February 2020 Requested Proof of Loss Did Not Impliedly Waive Plaintiff's Fraud

Plaintiff next argues that American Family's Counterclaims seek "to terminate the Policy"; that requesting a proof of loss is inconsistent with termination; and therefore American Family waived its Counterclaims when, in February 2020, it asked Plaintiff to provide the Requested POL. Motion pp. 16-17. This is the same theory espoused in Plaintiff's Fourth Claim for Relief, except here Plaintiff uses "termination" rather than "rescission" for the same concept that, by filing its Counterclaims, American Family allegedly ended Plaintiff's obligation to perform under the Policy.

American Family's July 19, 2022 Motion for Summary Judgment on Plaintiff's Fourth Claim for Relief (ECF 165) has already addressed this theory. In effect, this part of Plaintiff's First Motion is a cross-MSJ to ECF 165. For the reasons discussed in ECF 165, the Requested POL did not waive the Counterclaims.

Plaintiff's substitution of "termination" for "rescission" does not change the analysis. Just as American Family's Counterclaims did not rescind the Policy, neither did they terminate it. Rather, as ECF 165 explained, the Counterclaims affirm the Policy and seek contractual damages for its breach. A finding against Plaintiff under the Counterclaims would "void[] the insured's claim, not the policy." Ex. BB, *Sunflower* ECF 236 (Nov. 15, 2018) at p. 2. The insured "could, in theory, still submit a valid claim for other losses that occurred within the policy period." *Id*. *Accord* ECF 165, p. 12 (same quotations from *Sunflower*). Therefore American Family's counterclaims did not terminate the Policy.

C. **Plaintiff's and Impact's Misstatements of Fact Within its Estimates and Proof of Loss Are Actionable**

Subpoint C of Plaintiff's First Motion (ECF 166, p. 17) argues that the Impact Estimate is not actionable fraud but merely future projections. As an initial matter, American Family's Counterclaims include allegations of misrepresentations and fraud in the cost of Project X, as reflected in the Application for Payment to Plaintiff from RE, which Plaintiff subsequently used to generate construction pricing for all buildings. (ECF No. 87, ¶¶ 353-397.) The Project X costs are actuated and paid expenses, not estimates at all. Thus, even if the Court were inclined to disregard the Impact Estimate, which it should not, there would remain colorable claims of misrepresentation sufficient to sustain American Family's third Counterclaim.

However, Plaintiff's insistence that "the Estimate represents a difference of opinion between the parties and not actionable fraud" lacks merit. (ECF 166, p. 17.) Plaintiff cites cases for the proposition that an opinion regarding the happening of a future event is not actionable. (*See* ECF No. 166, pp. 17-18, citing *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009.)). In *Alpine Bank*, the Tenth Circuit defined this non-actionable "puffery" to be "those

24

vague generalities that no reasonable person would rely on as assertions of particular facts." *Id*. However, none of the cited cases involve insurance claims or estimates.

Judge Raymond P. Moore recently evaluated the same arguments from an insured who sought to preclude evidence that its public adjuster's estimates were allegedly inflated on the basis that they were only predictions of future events and therefore not actionable. *Wheatridge*, 578 F. Supp. 3d at 1217. Faced with the same arguments Plaintiff presents, Judge Moore concluded that the estimate could not be dismissed as non-actionable puffery, especially where the insured would rely on the estimates to prove its damages at trial. *Id.* Ultimately, there remained issues for the jury about whether the estimates could serve as a basis for claims of violation of an anti-misrepresentation clause. *Id.*

Plaintiff's attempt to characterize the Impact Estimate as "puffery" or non-actionable is misguided. While American Family agrees that the estimate has no basis in reality as to the actual costs of necessary repairs, Plaintiff adopted the Impact Estimate as the basis for its sworn POL. (SADF, ¶¶ 20-22.) A sworn document is taken seriously, not as puffery. Further, Plaintiff's initial disclosures incorporated the Impact Estimate as damages Plaintiff was seeking through this litigation. (*Id.*, ¶ 41.) Additionally, Plaintiff has disclosed O'Driscoll, the author of the Impact Estimate, as an expert to opine that it reflects a reasonable use of Xactimate to create an initial estimate of necessary cost to repair or replace the covered loss. (*Id.*, ¶ 65.) Plaintiff is promoting a double standard where it can rely on the Impact Estimate as credibly establishing an approximate, understated cost of repairs while attempting to preclude American Family from using the same estimate to prove misrepresentations. The Court should not allow Plaintiff to do so.

Additionally, American Family's allegations do not arise from assertions that the Impact Estimate is wrong in its projections of future happenings, such as future prices. As set forth in its detailed Counterclaims, American Family's allegations regarding the misrepresentations in the Impact Estimate and POL are based on the inclusion of numerous line items within the Estimate's scope of work that are unrelated to hail damage, are inflated, and include repair of purported damage to items that do not exist at the property. For example, the counterclaims assert that the scope of work in the Estimate includes installation of vented decks to remediate pre-existing ventilation problems. (SADF ¶¶ 24-26.)  But this is not covered under the Policy and is unnecessarily expensive, over-engineered, and exaggerated by approximately $575,000. (ECF No. 87, ¶¶ 112-116.) The inclusion of the vented deck line items in the Estimate is not merely a difference of opinion, or a vague generality regarding the happening of future events. It is a representation of what Plaintiff asserted it was owed under the Policy. Likewise, the Impact Estimate includes the cost to replace the stucco soffits on 14 buildings that do not even have stucco soffits, representing a significant misrepresentation of the necessary repair costs. (SADF ¶ 28.)

The Court should also not be dissuaded because the proof of loss form includes an attestation that the signor is not intending to misrepresent. If an insured is misrepresenting facts, its signature would merely be in furtherance of that misrepresentation.

Further, Plaintiff quotes language from the Estimate disclaiming that the scope of work the estimate is not final. (ECF No. 166, p. 19.) However, the referenced language claims the scope of repairs estimated is believed to be "grossly deficient". Where American Family's allegations arise from the wrongful inclusion of excessive work items in the estimate, a promise

26

that the estimate is insufficient, and its eventual substitution with a contractor estimate

(following Project X) which more than doubles the original estimate, augments American

Family's basis for asserting violation of the Policy based on misrepresentation.

**III.    RESPONSE TO MOTION 2: AMERICAN FAMILY HAS PLED A CONTRACT
CLAIM, NOT REVERSE BAD FAITH, AND ITS FOURTH COUNTERCLAIM IS
COGNIZABLE UNDER COLORADO LAW**

Plaintiff insists that American Family's Fourth Counterclaim alleges a "reverse bad faith"

tort claim. (Motion, p. 20.) This is incorrect. American Family is asserting a breach of contract

counterclaim based on Plaintiff's breach of its covenant of good faith and fair dealing.

The Policy is a valid contract. (ECF 89, ¶ 441.) Every contract contains an implied duty

of good faith and fair dealing. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995); *Soicher*,

2015 COA 46, ¶ 24. Insurance policies, as contracts, contain mutual implied duties of good faith

and fair dealing. *Soicher*, 2015 COA 46, ¶ 24 ("[I]n the context of insurance contracts, an insurer

has a duty to investigate and adjust claims in good faith, and <u>an insured has a corresponding duty

of good faith and fair dealing</u>." (emphasis added)); *Bailey v. Allstate Ins. Co.*, 844 P.2d 1336,

1339 (Colo. App. 1992) ("Because the insurer/insured relationship is contractually based, both

parties have a duty to protect their own interests, although each party also owes the other a duty

of good faith and fair dealing.")

In most contract claims, including claims by insurance companies against their insured, a

breach of the duty of good faith and fair dealing results in a claim for breach of contract. *Soicher*,

2015 COA 46, ¶ 26; *see also Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d

1359, 1363 (Colo. App. 1994) (when one party uses discretion conferred on it by the contract to

act dishonestly to deprive the other party of the benefit of the contract, the contract is breached).

In contrast, an insurer's breach of the duty of good faith and fair dealing uniquely results in a cause of action sounding in tort. *See Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003).

American Family's Fourth Counterclaim is a cause of action for breach of contract based on the implied covenant of good faith and fair dealing. *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (setting forth breach of contract claim elements). The Fourth Counterclaim pleads the existence of a valid contract (ECF No. 87, ¶ 441) including an implied covenant of good faith and fair dealing. (*Id.*, ¶ 471.) It also pleads that Plaintiff breached the covenant of good faith and fair dealing through a variety of actions and that American Family fulfilled its own Policy obligations. (*Id.*, ¶¶ 472-473.) Finally it pleads that American Family has suffered and continues to suffer damages from Plaintiff's breach. (*Id.*, ¶ 474.) These are allegations for breach of contract, not a tort claim. Thus, Plaintiff's second motion is baseless.

Plaintiff further incorrectly asserts that the Third Counterclaim already encompasses all contract-based duties imposable on Plaintiff. Not so. The Third Counterclaim specifically alleges that Plaintiff breached two particular Policy provisions: the Cooperation Clause and the Anti-Misrepresentation Clause. (*See* ECF No. 87, ¶¶ 443-447.) The contract-based duty of good faith and fair dealing applies when one party uses discretion conferred on it by the contract to act dishonestly. *Wells Fargo Realty*, 872 P.2d at 1363. Here, among other things, Plaintiff had discretion in its manner of presenting its claim, including the scope and content of its claimed damages and the results of Project X. In that space of discretion, the disputed facts of the case create questions which must be resolved by the fact finder about whether Plaintiff breached the covenant of good faith and fair dealing.

28

**IV.    RESPONSE TO MOTION 3: RECOUPMENT IS A RECOGNIZED CLAIM FOR INSURERS**

American Family's Fifth Counterclaim seeks reimbursement or recoupment of the $1.8 million in Claim benefits which American Family paid to Plaintiff. As pled in the Fifth Counterclaim, those benefits are the legally authorized damages for Plaintiff's breach of the Anti-Misrepresentation Clause. (ECF 87, ¶¶ 476-479.) Plaintiff's Third Motion seeks dismissal of the Fifth Counterclaim on three grounds: (1) "recoupment" is a setoff defense rather than an affirmative claim; (2) the Policy must authorize recoupment; and (3) *Boltz*, *Frontier Expl., Inc. v. Am. Nat'l Fire Ins. Co.*, 849 P.2d 887 (Colo. App. 1992), and *Nw. Nat'l Ins. Co. v. Barnhart*, 713 P.2d 1360 (Colo. App. 1985) allegedly are distinguishable because the word "void" appears in their anti-misrepresentation clauses but not in the Anti-Misrepresentation Clause here. All three arguments are incorrect.

**A.    <u>Recoupment is a Recognized Claim for Colorado Insurers</u>**.

As reflected in the title "Reimbursement/Recoupment," the Fifth Counterclaim uses the word "recoupment" for its everyday meaning of "reimbursement" of money previously paid. *See*, *e.g.*, www.dictionary.com ("recoup" means "to reimburse or indemnify; pay back"). *Accord* www.britannica.com ("to get back money that has been spent"). Consistent with this everyday meaning, Colorado insurance cases use the term "recoup" to denote an insurer's right to bring an affirmative claim against its insured for return of money the insurer previously paid under the policy:

- In *Cribari,* 861 F. App'x at 701-02, the court used "recoup" as a synonym for the insurer's right to "claw back" previously paid policy benefits.

- In *Valley Forge Ins. v. Health Care Mgmt.*, 616 F.3d 1086 (10th Cir. 2010), the court affirmed the insurer's right to sue its insured to recoup money the insurer spent in defending the insured. The court repeatedly used the words "reimbursement" and "recovery" synonymously with "recoupment" and held that the "doctrinal label" or "pigeonhole" for recoupment is immaterial. *Id*. at 1094.

- In *Wheatridge*, 578 F. Supp. 3d at 1204, Judge Moore denied the insured's motion for summary judgment on the insurer's recoupment counterclaim. Although "recoupment was originally a common-law equitable remedy that could be used only as a defense," recoupment now "is generally embraced in the subject of counterclaim." *Id*.

- In *Copper Oaks v. Am. Family*, 416 F. Supp. 3d 1115, 1120-21, 1131 (D. Colo. 2019), Judge Kreiger ruled that the insurer's "recoupment" counterclaim could proceed to trial.

- In *Sunflower*, 2018 WL 2196089 (May 14, 2018), Judge Martinez denied the insured's motion for summary judgment on the insurer's counterclaims for "recoupment" and breach of contract.

- In *Auto-Owners Ins. v. Summit Park*, 2016 WL 1321507, at *4 (D. Colo. Apr. 5, 2016), *aff'd* 886 F.3d 852 (10th Cir. 2018), Judge Babcock approved the insurer's right "to recoup" an appraisal award.

Plaintiff cites none of the foregoing cases. Instead, it cites irrelevant cases that arise outside the insurance context, do not apply Colorado law, and/or apply an outdated concept of "recoupment." The Fifth Counterclaim is not an archaic equitable remedy. It properly states an affirmative claim, and it meets the requirements of Fed. R. Civ. P. 8.

**B.    Colorado Insurers May Bring a Recoupment Claim Even When Not Specified in the Policy**

In *Cribari*, 861 F. App'x at 701, the Tenth Circuit held that Colorado law allows recoupment recoup even when the policy is silent about recoupment. *Accord Valley Forge*, 616 F.3d at 1090-93 (insurer's right to recoup exists under Colorado law even if not expressly contained in the policy). The payments in *Cribari* and *Valley Forge* were made under an ROR. As previously discussed regarding Plaintiff's waiver argument, American Family's payments to Plaintiff were made under RORs and anti-fraud warnings. (SADF, ¶¶ 18-19, 39.) Therefore, the Fifth Counterclaim states a valid claim even though no Policy provision expressly authorizes recoupment.

More importantly, recovery of previously-paid insurance benefits is independently authorized by Colorado law. When a Colorado insured breaches the policy's anti-misrepresentation clause (often called a "fraud clause"), then the insurer's damages "are breach-of-contract damages equal to policy payments it had no duty to make given [the insured's] breach of the fraud clause." Ex. BB, *Sunflower*, ECF 236 at p. 2 (Nov. 15, 2018). For this proposition, *Sunflower* cited *Frontier*, 849 P.2d at 892, and *Barnhart*, 713 P.2d at 1361, where the insurers both received those damages plus interest. *Sunflower* also awarded damages equal to the value of the insurer's prior policy payments plus interest. Ex. CC, *Sunflower*, ECF 237 (Nov. 15, 2018). None of these cases included damages based on a policy provision or preserved under an ROR. Therefore those damages are available without regard to the policy or an ROR.

Similarly, as American Family explained in its Motion for Summary Judgment on Plaintiff's Fourth Claim for Relief, return of the $1.8 million it paid to Plaintiff is established Colorado contractual compensation because it is the loss American Family sustained from

31

Plaintiff's breach. ECF 165 at p. 11, citing *Decker v. Browning-Ferris Indus. of Colo., Inc.*, 931

P.2d 436, 446 (Colo. 1997). Further, Colorado damages for breach of contract can include

"restitution … of any benefit" the aggrieved party previously conferred on the breaching party.

ECF 165 at 11, citing *Tincombe v. Colo. Constr. & Supply Corp.*, 681 P.2d 533, 535 (Colo. App.

1984), and *Ed Hackstaff Concrete, Inc. v. Powder Ridge Condo. "A" Owners Ass'n, Inc.*, 679

P.2d 1112, 1114 (Colo. App. 1984). Because recoupment is authorized by Colorado law, no

further authorization is needed.

### C.    As shown in Sunflower, Recoupment is Appropriate here

Plaintiff also contends that because *Boltz*, *Barnhart*, and *Frontier* contain the word

"void" in their anti-misrepresentation clauses, recoupment is not allowed where, as here, the

Anti-Misrepresentation Clause does not contain that word. Plaintiff appears to argue that prior

payments were returned in *Barnhart* and *Frontier* only because money is generally returned

when a transaction is void.[2] This argument has no merit.

*Boltz* is not based on return of money when a transaction is void. *Boltz* is founded on the

public policy determination that when an insured submits an inflated claim, then the insured is

not just denied payment for the inflated portion of the claim; rather, the insured incurs the

"penalty" of forfeiting insurance benefits for all <u>non-inflated</u> portions of the claim too. The

---

[2] In *Boltz* the insurer was able to quickly detect the insured's fraud and so never paid any benefits; thus the question of returning prior-paid benefits did not arise in that case. In *Barnhart* benefits were paid before the fraud was detected. In *Frontier* some benefits were paid before the insured breached the anti-misrepresentation clause.

penalty is a necessary deterrent, because otherwise insureds who submit inflated claims would

enjoy "an everything-to-win, nothing-to-lose proposition." 482 F.2d at 798.[3]

It follows that when an insured submits a fraudulent claim, "the insurance company is

entitled to damages in the amount already paid out to the insured" on that claim. *Wheatridge*, 578

F. Supp. 3d at 1204. Thus, the insurers in *Sunflower*, *Frontier*, and *Barnhart* were awarded

return of the payments they had previously made to their insureds (plus interest). The presence of

the word "void" in the policy was not the reason the money was returned in those cases. The

money was returned under *Boltz's* public policy determination that an insured who submits a

fraudulent claim forfeits all insurance benefits from the claim.

Furthermore, the *Sunflower* anti-misrepresentation clause contains the exact same

language as Plaintiff's policy here. *Sunflower,* 2017 WL 6276460, at *3 (D. Colo. Dec. 11,

2017), *recommendation adopted*, 2018 WL 1755794 (D. Colo. Apr. 12, 2018); *cf.* SADF ¶ 4.

The *Sunflower* clause, as with the clause here, does not contain the word "void." Instead, it stated

the insurer "will not pay" if the insured commits fraud. Because an insurer is contracted to "pay"

insurance claims submitted by its insured, this language means the insurer will not pay benefits

on a fraudulent claim. Plaintiff's Motion conspicuously fails to cite *Sunflower* even though the

---

[3] *Accord Nesjan v. Allstate Fire & Cas. Ins. Co.*, 2020 WL 2494616, at *5 (D. Colo. May 14, 2020) ("violation of a fraud clause voids the entire claim, not just the portion it pertains to"); *Benson v. Allstate*, 2020 WL 227829, at *2 (same); *Sunflower*, 2018 WL 2196089 at *3 (insured's breach of anti-misrepresentation clause "void[s] the entire claim, not just the portion to which the fraud pertains"); *Martinez v. Hartford Underwriters Ins. Co.*, 2014 WL 2016569, at *2 (D. Colo. May 15, 2014) ("Significantly, violation of a fraud clause voids the entire claim, not just the portion i[t] pertains to.").

pertinent language of that policy's anti-misrepresentation clause is the exact same as the Anti-Misrepresentation Clause here.

In *Sunflower*, the insurer paid the insured $608,409.96 on a hail damage claim. 2018 WL 2196089 at *2. The insured sued for breach of contract and bad faith, and the insurer counterclaimed for recoupment and breach of contract. Relying on the *Boltz* doctrine, Judge Martinez denied the insured's motion for summary judgment on the counterclaims. *Id*. at *3. The insured's claims were dismissed on summary judgment, and the case went to trial on the insurer's counterclaims. The insurer prevailed. Judge Martinez entered a $713,762.14 final judgment for the insurer—the amount of the benefits paid, plus interest. Ex. CC *Sunflower* ECF 237 (Nov. 15, 2018). The Tenth Circuit affirmed. 802 F. App'x at 381-82.

*Sunflower* establishes that *Boltz*, *Frontier*, and *Barnhart* apply to Plaintiff's Anti-Misrepresentation Clause. If a policy bars payment when the insured submits an inflated claim—regardless whether the language states "we will not pay" or that coverage is "void"—then the insured forfeits all insurance benefits under that claim, and consequently the insurer is entitled to reimbursement of any benefits it previously paid (plus interest). That is the situation here. Plaintiff's Third Motion therefore must be denied.

## V.    RESPONSE TO MOTION 4: AMERICAN FAMILY'S COUNTERCLAIMS FOR DECLARATORY RELIEF ARE LEGALLY COGNIZABLE

Plaintiff's Fourth Motion seeks dismissal of American Family's First and Second Counterclaims. Plaintiff is wrong as to the First Counterclaim. American Family consents to dismiss its Second Counterclaim without prejudice, provided it may pursue its second and third defenses in lieu of the Second Counterclaim.

A.      **The First Counterclaim Properly Seeks a Declaratory Judgment**

Plaintiff contends that the First Counterclaim: (1) does not involve an existing case or controversy, because it merely seeks confirmation that Plaintiff breached the Policy in the past as alleged in the Third Counterclaim; and (2) duplicates the Third Counterclaim. Plaintiff therefore asks the Court to exercise its discretion under 28 U.S.C. § 2201 (Declaratory Judgment Act, "DJA") to decline jurisdiction over the First Counterclaim. Motion, p. 28.

These arguments misread the First Counterclaim, which is uniquely based on Plaintiff's violation of the Policy's Full Compliance Clause. The First Counterclaim pleads that the Policy requires the insured to fully comply with the policy terms before filing suit against American Family, but that Plaintiff sued American Family even though Plaintiff had violated the Policy's Anti-Misrepresentation clauses and had refused to provide the Requested POL. (ECF 87, ¶¶428-430.) Because Plaintiff sued American Family without first fully complying with all Policy terms, Plaintiff's continued maintenance of its claims against American Family is improper. (ECF 87, ¶ 431.) Thus, the First Counterclaim seeks a declaration that Plaintiff violated the Full Compliance Clause when it sued American Family, and as a consequence, Plaintiff's Complaint must be dismissed.

The First Counterclaim's Full Compliance theory negates both of Plaintiff's arguments.

(1) The theory espouses an ongoing case or controversy—whether Plaintiff may continue to prosecute Complaint against American Family.

(2) The theory does not duplicate the Third Counterclaim. The Third Counterclaim (entitled "Breach of Contract") alleges that Plaintiff breached the Policy's Anti-Misrepresentation and Cooperation Clauses. (ECF 87, ¶¶ 439-69.) The Third Counterclaim does

35

not allege that, due to those breaches, the Full Compliance Clause barred Plaintiff from institing this lawsuit against American Family. This last allegation is the crux of the First Counterclaim, and it is based on the Full Compliance Clause which the Third Counterclaim does not mention.[4]

Therefore Plaintiff's arguments for summary judgment on the First Counterclaim are therefore misplaced and should be rejected.

**B.      American Family Voluntarily Dismisses its Second Counterclaim Without Prejudice, Provided its Second and Third Defenses Remain**

Citing *L-3 Communications v. Jaxon Eng.*, 69 F. Supp. 3d 1136, 1145 (D. Colo. 2014), Plaintiff argues the court should decline to exercise DJA jurisdiction over the Second Counterclaim because it duplicates American Family's Second and Third Affirmative Defenses. Plaintiff seeks dismissal of the Second Counterclaim without prejudice so that American Family may continue to assert those two defenses. Motion, p. 29.

American Family consents to dismissal of its Second Counterclaim without prejudice, meaning that American Family can continue to assert the substance of the Second Counterclaim by way of its Second and Third Defenses. *See* Fed. R. Civ. P. 8(c)(2) ("[i]f a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so").

---

[4] Also, although Plaintiff asserts that the First Counterclaim should be dismissed in favor of resolution of the allegedly duplicative Third Counterclaim on its merits (Motion, p. 28), Plaintiff's First Motion seeks dismissal of the Third Counterclaim on its merits (Motion, p. 20). Thus, there could be no duplication even under Plaintiff's own terms.

36

## **CONCLUSION**

Based on the foregoing, Plaintiff's Motions for Summary Judgment should be denied

except that the Second Counterclaim may be dismissed without prejudice, provided that

American Family may pursue its second and third defenses in lieu of the Second Counterclaim.

Dated:  September 7, 2022                    Respectfully submitted,


*s/ Megan B. Treseder*
Terence M. Ridley
Megan B. Treseder
Dean Neuwirth
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO  80203
Telephone:   303.839.3800
Facsimile:    303.839.3838
Email:   tridley@spencerfane.com
            mtreseder@spencerfane.com
             dneuwirth@spencerfane.com

Habib Nasrullah
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO  80202
Telephone:   303.244.1800
Facsimile:    303.244.1879
Email: nasrullah@wtotrial.com


Attorneys for Defendant
American Family Mutual Insurance Company

38

**CERTIFICATE OF COMPLIANCE WITH THE COURT'S TYPE-
VOLUME LIMITATIONS**

I certify that the foregoing pleading complies with the proportionally spaced serif font requirement (here, Times New Roman) in Judge Domenico's Civil Practice Standard I(D).

I further certify that this motion complies with Judge Domenico's Civil Practice Standard III(A)(2) as modified in this case by his July 19, 2022 Order granting American Family's Motion for Leave to Exceed the Summary Judgment Word Limit, in that this motion contains 9,985 words (including footnotes but excluding caption, signature block, certificate of service below, and this certificate of compliance) and this motion is part of a total of no more than 10,000 words for American Family's response to Plaintiff's combined summary judgment motions.

*s/ Megan B. Treseder*

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on September 7, 2022, I electronically filed the foregoing **AMERICAN FAMILY'S RESPONSE TO CANYON CLUB'S COMBINED MOTIONS FOR PARTIAL SUMMARY JUDGMENT AGAINST AMERICAN FAMILY'S DEFENSES AND COUNTERCLAIMS (ECF NO. 166)** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **Christopher N. Mammel**
  cmammel@merlinlawgroup.com, tchensee@merlinlawgroup.com, dreyes@merlinlawgroup.com, asasko@merlinlawgroup.com

- **Dean Steven Neuwirth**
  dneuwirth@spencerfane.com, arutherford@spencerfane.com, lnorris@spencerfane.com

- **Habib Nasrullah**
  nasrullah@wtotrial.com, goodwin@wtotrial.com, winiarski@wtotrial.com

- **Terence M. Ridley**
  tridley@spencerfane.com, lnorris@spencerfane.com, sallen@spencerfane.com

- **Megan Bitner Treseder**
  mtreseder@spencerfane.com, kkern@spencerfane.com

- **Michael William Duffy**
  mduffy@merlinlawgroup.com, ileservice@merlinlawgroup.com

*s/ Megan B. Treseder*
Megan B. Treseder
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO  80203
Telephone:    303.839.3800
Facsimile:    303.839.3838
Email: mtreseder@spencerfane.com

Attorney for Defendant
American Family Mutual Insurance Company