IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-00683-DDD-STV

CANYON CLUB CONDOMINIUM OWNERS
ASSOCIATION,

    Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE
COMPANY, a corporation,

    Defendant.

---

**DEFENDANT AMERICAN FAMILY MUTUAL INSURANCE COMPANY'S MOTION
TO EXCLUDE CERTAIN EXPERT OPINIONS OF EDWARD FRONAPFEL
PURSUANT TO FED. R. EVID. 702 AND 403**

---

Defendant American Family Mutual Insurance Company ("American Family"), through

its counsel, files this Motion to Exclude Certain Expert Opinions of Edward Fronapfel Pursuant

to Fed. R. Evid. 702 and 403.

## CERTIFICATE OF CONFERRAL

Counsel for American Family has conferred with Plaintiff's counsel and Plaintiff is

opposed to the relief requested in this motion.

## INTRODUCTION

In this property-damage insurance case, Plaintiff disclosed the opinions of Edward

Fronapfel, the CEO of engineering firm SBSA, Inc.  Fronapfel/SBSA were retained by Plaintiff

prior to this litigation, and prepared a report dated June 17, 2017. In his pre-litigation report,

Fronapfel concluded, among other things, that moisture damage to the roof structure and interior

components was caused by an accumulation of water vapor due to inadequate ventilation throughout the Property.

After Plaintiff commenced this lawsuit, however, Fronapfel/SBSA prepared a second report, dated August 26, 2020, containing Fronapfel's affirmative expert opinions. Therein, Fronapfel changed course from his prior conclusions, now hypothesizing that the moisture damage was caused by storm water entering the roof assembly through "hail-caused openings" in the roof. This new opinion was generated more than three years after the original SBSA report and more than four years after the date of loss, and is based on the observations of a single unit owner in 2017. Fronapfel's newly minted causation opinion, however, is deficient in several respects, including:

- He fails to identify any "pathway" for ingress of storm water through hail-damaged shingles;

- He fails to connect this opinion to any destructive or intrusive testing;

- He engaged in no differential analysis to support his water-intrusion conclusion;

- He did not interview the sole unit owner on which his opinion is based; and

- His extrapolation to 41 buildings and 175 units, based solely on one unit, is statistically inadequate.

These obvious methodological flaws are consistent with Fronapfel's prior shortcomings as an expert, as determined in *Owners Ins. Co. v. 11380 E. Smith Rd., LLC.* No. 17-cv-00346-PAB-MEH, 2021 WL 1015982, at *5 (D. Colo. Mar. 17, 2021) (excluding Fronapfel's opinion that an estimate is "reasonable and accurate" where he failed to apply any methodology to support such opinion).

In addition to these striking inadequacies, Fronapfel also advances methodologically unsupported opinions on "building code" application. Fronapfel provided repair recommendations, including extensive, alleged "code-required" repairs to numerous components of the property unaffected by the hailstorm. Based on Fronapfel's repair recommendations, Plaintiff has increased its claimed covered damages from approximately $8 million to $19.35 million, which includes more than $1.2 million in percentage-based fees to be paid to Fronapfel's company. However, just as with his causation opinion, Fronapfel's report fails to provide any methodology or reasoning for his unacceptably vague opinions relating to the necessity of the alleged "code-required" repairs.

As explained further below, Fronapfel's challenged opinions are entirely unsupported and inherently unreliable. In the absence of any scientific or specified methodology, Fronapfel's opinions amount to nothing more than *ipse dixit*. Accordingly, the Court should exclude such opinions for failing to meet the requirements of Fed. R. Evid. 702. The Court should also exclude the opinions under Rule 403 to prevent jury confusion.

**FACTUAL BACKGROUND**

### I.      THE CLAIM

Plaintiff's condominium complex, which was constructed in 1969 and consists of 41 buildings containing 175 residential units, sustained hail damage in a July 2016 hailstorm. (*See* Plaintiff's Answer ECF 89 ¶¶ 2, 20.) Through a public adjuster, Derek O'Driscoll,[1] Plaintiff

---

[1] O'Driscoll is the subject of a FRE 702 motion currently pending before the Court, (ECF No. 195), and has been the subject of discussion before other courts in this district. *See Copper Oaks Master Home Owners Ass'n v. Am. Fam. Mut. Ins. Co.,* 15-cv-01828-MSK-MJW, 2018 WL 3536324 (D. Colo. July 23, 2018); *GSL Grp., Inc. v. Travelers Indem. Co.,* 18-cv-00746-MSK-SKC, 2021 WL 4245372 (D. Colo. Sept. 16, 2021).

reported a hailstorm insurance claim to American Family. (*Id.*) Plaintiff also retained Edward Fronapfel and his engineering firm, SBSA, Inc., to assist with the claim and provide a scope of repairs. (*Id.* ¶ 69.) SBSA issued several reports over several years. (*See infra* Factual Background, § II.)

American Family investigated the claim through its consultants and issued actual cash value payments for costs to, among other things, remove and replace the property's shingles. (ECF 175-11, p. 6 of 10, ¶¶ 1-3; ECF 165-2, p. 2.) American Family has paid Plaintiff $1.8 million in actual cash value toward $2.7 million in replacement repair costs. To American Family's knowledge, Plaintiff has not performed any repairs—including replacement of shingles—on any building other than Building 15 (14).[2]

In 2018, Plaintiff filed this lawsuit against American Family, alleging breach-of-contract and bad faith damages. Plaintiff initially alleged about $8 million in hailstorm repair costs for its breach of contract claim, based on a proof of loss submitted by O'Driscoll. (Plaintiff's Answer, ECF No. 89, ¶¶ 86, 91.) Plaintiff has since dramatically escalated this claimed amount to $19.35 million based, in part, on the expansive scope of repair made by Fronapfel/SBSA. (ECF No. 87, ¶¶ 267, 270, 278; ECF No. 163-7, p. 4.)

Of the total claimed damages, SBSA stands to gain $1,272,073.29 in percentage-based fees for design and construction administration services to be provided by SBSA. (*See* RE Estimate, ECF No. 162-9, at 7.) This sum is in addition to the more than $67,000 in fees already charged by SBSA for design and architectural services related to Building 15 (14) (referred to as

---

[2] It is also American Family's understanding that Plaintiff has not used any of the insurance proceeds to replace any of the roofs or perform any other repairs.

"Project X"), which was the "exemplar" building that Fronapfel/SBSA and Plaintiff's chosen contractor repaired in an effort to justify its inflated repair projection.

## II.    SBSA REPORTS AND FRONAPFEL'S AFFIRMATIVE EXPERT OPINIONS

SBSA has prepared four reports in connection with the claim, spanning the course of more than four years, each of which were reportedly reviewed and approved by Fronapfel.  The focus of this motion is on the original SBSA report and the subsequent report, dated August 26, 2020, submitted by Fronapfel in connection with this action under Rule 26(a)(2)(b).

SBSA's first report, dated June 19, 2017, was prepared by Dr. Craig Dixon, Ph.D., before Plaintiff commenced this action. (Ex. 1, June 2017 SBSA Report.) In this original 82-page report, Dixon/SBSA opined that Plaintiff's property had inadequate ventilation. (*Id.* at 36-37, 55-60.) SBSA explained that air inside residential buildings contains occupant-generated water vapor from daily activities such as showering and cooking. And because warm air rises, interior air containing water vapor (i.e., interior moisture) rises toward the inside of the roof. (*Id.* at 36, 56-57.) SBSA concluded that, because the ceiling-roof assemblies were not constructed to control the build-up of moisture from within the assembly space, the accumulated interior moisture had damaged roofing components. (*Id.*) The original SBSA report did not attribute any moisture damage to direct physical loss caused by hail. In fact, SBSA noted that it "visually inspected the roof covering for possible sources of water penetration through the roof covering, none were identified." (*Id.* at 37 (emphasis added).)

On August 31, 2020, more than three years after the original SBSA report and more than four years after the hailstorm, litigation expert disclosures occurred. Among its expert disclosures, Plaintiff disclosed a new SBSA report dated August 26, 2020, which contains the

opinions that Fronapfel is expected to proffer in Plaintiff's case-in-chief. (Ex. 2, August 2020

SBSA Report.) The August 2020 SBSA Report was prepared by Fronapfel's daughter, Heidi

Klein (who has not been disclosed as a Rule 26 expert). The report repeats many of the same

observations and conclusions made by Craig Dixon in the June 2017 SBSA Report, including

SBSA's acknowledgment that the properties are not adequately ventilated, which has resulted in

the accumulation of interior moisture. (*Id.* at 9-11, 37-39.) However, unlike the pre-litigation

June 2017 SBSA Report, the August 2020 SBSA Report also opines—for the first time—that the

moisture damage was attributed "hail-caused openings resulting in water migration into the

roofing assemblies." (*Id.* at 102.) This newly formed causation opinion appears to be based

solely on a single unit owner—Unit 46 in Building 15 (14)—reportedly noticing a few interior

cracks and a leak in February 2017, which was known to SBSA at the time of its pre-litigation

report. (*Id.* at 11, 20, 39; Ex. 1 at 9.) The August 2020 SBSA Report does not identify or

document any instance of water infiltrating the property through a supposed "hail-caused

opening," does not quantify how much water supposedly entered the property this way, does not

inventory or list which other units, if any, have actually sustained leaking, and does not specify

when particular units experienced such leaking.

Notwithstanding this lack of methodology, the August 2020 SBSA Report also includes

numerous repair recommendations. Among these recommendations are repairs to components of

the property that were unaffected by the hailstorm—including fire separation walls (that never

existed before the hailstorm), elaborate ventilation systems, interior chimney flues, and

insulation—all for the supposed purpose of bringing them into compliance with "building code."

(*See* Ex. 2, August 2020 SBSA Report, at 97, 103-104.) The report, however, fails to cite any

specific section of a building code and, in fact, fails to identify any allegedly applicable

"building code." It further fails to provide any explanation for how repairs to the property

actually damaged by hail (e.g. the asphalt roof shingles) necessitate the litany of alleged code

upgrades.

<u>**STANDARD OF DECISION**</u>

American Family adopts the general Rule 702 standard in *Immel v. Union Pacific

Railroad*, 2020 WL 8254270, at *1 (D. Colo. Feb. 11, 2020) (Domenico, J.).

<u>**ARGUMENT**</u>

**I.    The Court should exclude Fronapfel's opinion that the hailstorm caused water intrusion into the roofing assemblies and resulting water damage to the structural elements, insulation, and gypsum ceilings.**

In the June 2017 SBSA Report, SBSA/Fronapfel concluded that Plaintiff's buildings had

inadequate ventilation, and that accumulated water vapor/interior moisture had affected the

roofing components, such as the structural roof wood members, insulation, and gypsum ceilings.

(Ex. 1, June 2017 SBSA Report, at 36-37, 55-60.) There was no mention of water damage

resulting from hail-caused roof penetrations or openings. Several years later, Fronapfel changed

course in an apparent attempt to create "direct physical loss" under the policy and to further

inflate Plaintiff's claimed damages. In SBSA's August 2020 report, Fronapfel downplays the

established causal factor—preexisting inadequate ventilation—and, instead, attributes "moisture

damage/staining to structural elements and gypsum ceilings" to alleged "hail-caused openings

resulting in water migration into the roofing assemblies." (Ex. 2, August 2020 SBSA Report, at

102; *see also id.* at 11, 17-18, 20, 37-38, 81, 91.) However, this radically altered opinion is

7

unsupported by sufficient facts or data and is not the product of reliable methodology, as required by Fed. R. Evid. 702.

"It is the specific relationship between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute that renders testimony both reliable and relevant." *11380 E. Smith Rd., LLC*, 2021 WL 1015982, at *2; *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) ("Use of outdated or suspect data as the base of an expert's testimony are proper grounds to exclude that testimony."). An expert must "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

Here, experts on both sides, including SBSA, agreed—relatively soon after the loss— that the pre-existing ventilation conditions caused interior moisture development/vapor within the roof assemblies. (*See, e.g.,* Ex. 1, June 2017 SBSA Report, at 36-37; Ex. 3, August 31, 2020 AAG Report, at 38-61.) They reached this conclusion through the application of reliable methodology, which included inspections, visual observations, photographs, certain intrusive investigations and logical scientific explanation relating to condensation borne of pre-existing inadequate ventilation. (Ex. 1, June 2017 SBSA Report, at 36-37; Ex. 3, August 31, 2020 AAG Report, at 38-61.) In contrast, Fronapfel fails to apply any such methodology in now concluding that hail penetrations caused water damage. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Fronapfel's opinion that there is a causal link between the hailstorm and water damage in the buildings is based on the testimony of Angela Becker, owner of unit 46 in Building 15 (14).

According to the August 2020 SBSA report, Ms. Becker testified that she first noticed cracks in her ceiling in early February 2017, and that she noticed leaks occurring from such cracks. (Ex. 2, at 39-40.) Based on the timing of Ms. Becker's observations of interior damage, Fronapfel jumps to the conclusion that "water entered the roof system . . . by way of hail-caused openings in the asphalt shingle roof coverings." (*Id.* at 91; *see also id.* at 11, 38.)[3] He then extrapolates this conclusion to all 175 units and recommends repairs accordingly. (*Id.* at 106.) This is not a valid or reliable methodology. *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (the Court must consider "whether the reasoning or methodology underlying the testimony is [. . .] valid."); *Heer v. Costco Wholesale Corp.*, 589 Fed. Appx. 854, 857 (10th Cir. 2014) (excluding expert's opinion where, "[a]bsent from [the expert's] report was any discussion of tests, calculations, or industry standards, or the application of engineering principles supporting his [causation] theory"). It is speculation, at best. *See, e.g., Black v. M & W Gear Co.,* 269 F.3d 1220, 1237–38 (10th Cir. 2001) (affirming exclusion of expert because the expert "had not based his conclusion on the results of tests or calculations specific to [the plaintiff's] accident"); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate.")

---

[3] At her deposition, Ms. Klein, the author of the August 2020 SBSA Report, confirmed that this opinion was based on the timing of the reported damage:

> Q.   Do you know whether or not those potential areas of alleged water intrusion have any correlation to the 2016 storm?
>
> A.   I think we were basing it on timing. I know there's photos with Gary Stevens of Derek O'Driscoll's stuff, the files we reviewed of interior damages. Cornell reviewed interior damages at Building 14. And most of those damages were reported after the 2016 event.

(Ex. 6, Klein Dep. Tr., 123:10-18.)

In rendering his causation opinion, Fronapfel never takes the step to demonstrate or specify where storm water is purportedly entering the 41 buildings, when water purportedly entered them, or even attempt to quantify how much water was allegedly entering the buildings.[4] He fails to identify a single location amongst the 41 buildings, consisting of 175 units, where water is entering the roof assembly through supposed "hail-caused openings."  Indeed, in June 2017, SBSA noted that it (Craig Dixon) inspected the roof covering of Building 15 (14)—the building on which Fronapfel bases his opinion—and identified no possible sources of water penetration. (Ex. 1, June 2017 SBSA Report, at 37.) Fronapfel admits that after 2017, SBSA took no further efforts to identify possible sources of water penetration through the roof covering of Building 15 (14). (Ex. 4, Fronapfel Dep. Tr., at 222:8-13.) And while Fronapfel recommends repairs consistent with those done at Building 15 (14) to all buildings for expected hail-caused water damage, he testified that he is not aware of any leaks being reported in any of the other units. (*Id.* at 311:6-19.) Extrapolating from one anecdote in one unit to the remaining 174 units is simply inadequate, statistically speaking or otherwise. *See, e.g., U. S. v. Crabbe*, 556 F. Supp. 2d 1217, 1228 (D. Colo. 2008) (finding an expert's opinion, which was based on improper extrapolation from an insufficient sample size, lacked a reliable methodology and sufficient facts).

---

[4] Ms. Klein testified that SBSA could not determine: the extent of water damage caused by alleged water migration, as opposed to interior moisture/condensation from inadequate ventilation; how much water was entering the roofing assembly through alleged "hail-caused openings"; or even when water entered the roofing assembly. (*See* Ex. 6, Klein Dep. Tr., 118:21-121:8, 124:1-6.)

The unreliability of Fronapfel's opinion is compounded by his failure to consider crucial information. During his deposition, Fronapfel admitted that he did not personally walk on *any* of the roofs or enter *any* of the attics of the Plaintiff's buildings, other than Building 15 (14). (Ex. 4, Fronapfel Dep. Tr. at 152:22-153:14.) And despite relying on Ms. Becker's testimony for his causation opinion, Fronapfel never bothered to interview her. (*Id.* at 155:8-156:1.) He also never interviewed or read the testimony of anyone responsible for the maintenance of Plaintiff's properties, including Adam Blake, the maintenance supervisor. (*See id.* at 308:24-309:21). Had he done so, he would have known several unit owners complained of leaks occurring shortly after the roofs were replaced in 2012-2013, well before the subject hailstorm. (*See* Ex. 5, Blake. Dep. Tr., at 82:2-84:12.) In fact, Mr. Blake recalled that there were leaks reported in the same building that is now occupied by Angela Becker shortly after such roof replacement work. (*Id.* at 84:13-85:14.)

In sum, Fronapfel's causation opinion is not "based on facts which enable [Fronapfel] to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). His opinion is not reliable as he fails to provide a sufficient factual basis to support it. *See Joiner*, 552 U.S. at 146 (a court may exclude an expert opinion if it "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered.") Indeed, Fronapfel's belated change of opinion during the course of this litigation—four years after the event—despite the lack of evidence or analysis justifying such a change, leads to the inescapable conclusion that his opinion was "prepared solely for purposes of this litigation and without any thought to the required elements under Rule 702." *See Squires ex rel. Squires v. Goodwin,* 829 F.Supp.2d 1041, 1054 (D. Colo. Nov. 7,

2011); *Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158, at *3 (4th Cir. 1998) ("Another

significant fact weighing against admitting the testimony is where, as here, the expert developed

his opinions expressly for the purposes of testifying.").

**II.    The Court should exclude Fronapfel's opinion that systems and components of the
property are required to be brought into compliance with current "building code."**

**A.    Fronapfel's "building code" opinions should be excluded under Rule 702.**

In SBSA's August 26, 2020 report, Fronapfel vaguely opines on repair recommendations

which include bringing existing conditions into conformance with current "building code."[5] Such

conditions had not sustained any damage from hail, but were purportedly observed by Fronapfel

during the course of the (unnecessary) reconstruction of Building 15 (14)—referred to in other

pending motions as "Project X." (*See*, *e.g.,* ECF No. 162; ECF No. 195.) Specifically, Fronapfel

proffers the following opinions related to alleged building code-required repairs:

- "The existing construction does not provide code-required fire separation assembly
  between the units, nor does it have fire-resistant treated decking extending 4-feet on
  either side of the shared wall of the abutting units. Discovery of these conditions
  requires repair as there is a potential life-safety condition that has been exposed. The
  fire separation is a current requirement by the City and County of Denver for
  townhome construction, such as Building 15 (14). (Ex. 2, August 2020 SBSA Report,
  at 97; Ex. 4, Fronapfel Dep. Tr. at 300:19-301:3.)

- SBSA's "general recommendations for repair" are "intended to provide repairs in
  conformance with the applicable building code and industry standard of care." (Ex. 2,
  August 2020 SBSA Report, at 103.) Such recommendations include providing "code-

---

[5] Denver adopted the International Code Council (ICC) codes, which include the
International Building Code (IBC), International Existing Building Code (IEBC), International
Plumbing Code (IPC), International Mechanical Code (IMC), International Residential Code
(IRC), International Fuel Gas Code (IFGC), International Fire Code (IFC), International Energy
Conservation Code (IECC) and also abides by the National Electrical Code (NEC).

Copies of the ICC codes adopted by Denver are available to the public online at:
https://www.denvergov.org/Government/Agencies-Departments-Offices/Agencies-Departments-
Offices-Directory/Community-Planning-and-Development/Building-Codes-Policies-and-Guides.

compliant ventilation systems for vaulted and attic roof-ceiling assemblies," (*id.*; *see also* Ex. 4, Fronapfel Dep. Tr. at 87:5-9), as well as new insulation. (*Id.* at 249:2-9, 261:16-24, 268:13-269:8, 270:2-7.)

Like Fronapfel's causation opinion discussed above, his code-related opinions also fail to meet the requirements of *Daubert* and Fed. R. Evid. 702. Initially, Fronapfel's August 2020 report fails to provide any methodology or reasoning for his opinions relating to the necessity of the alleged "code-required" repairs. *See Joiner*, 522 U.S. at 146; *see also 11380 E. Smith Rd., LLC*, 2021 WL 1015982, at *5 (excluding Fronapfel's opinion that an estimate is "reasonable and accurate" where he failed to apply any methodology to support such opinion). Reliable methodology would call for reference to a specific building code, as well as citations to specific code section(s). Fronapfel does neither. Not only does the report fail to identify the purported building code that requires such repairs, it also fails to offer any explanation for why such "code upgrades" would be required in the course of repairing hail damage to the roof. (*See* Ex. 2, August 2020 SBSA Report.) *See Crest Exteriors, LLC v. Am. Fam. Mut. Ins. Co.*, 19-cv-02065-REB-SKC, 2020 WL 8181823, at *3 (D. Colo. Oct. 27, 2020) (excluding expert opinion where the "court cannot adequately or accurately assess whether [the expert] considered enough information to make his opinions reliable").

Moreover, Fronapfel's deposition testimony confirmed that his methodology is fundamentally flawed, as his analysis of the "building codes" skips a critical step. It is undisputed that the Plaintiff's property is comprised of *existing* buildings. Thus, it is also undisputed that repairs to Plaintiff's existing property are governed by the International Existing Building Code ("IEBC"), as adopted by the City and County of Denver. (*See supra* n. 5) Indeed, the International Building Code states: "The provisions of the International Existing Building

13

Code <u>shall</u> apply to matters governing the repair, alteration, change of occupancy, addition to and relocation of existing buildings." IBC 2018 Edition, 101.4.7 (emphasis added). Accordingly, it is undisputed that the IEBC governs whether repair work is required to be brought into conformance with current codes or if the repair work can be performed in a manner consistent with the existing conditions prior to needing repair.[6] Fronapfel completely ignores the IEBC.

Indeed, even during his deposition, Fronapfel testified that the IEBC was not part of his analysis of the applicable codes. (Ex. 4, Fronapfel Dep. Tr. 294:20-25.) Fronapfel's failure to consider the applicable code renders his code-related opinions inherently unreliable and, therefore, inadmissible under Rule 702. *See, e.g., Heer*, 589 Fed. Appx. at 862 (an expert's "failure to address the ANSI standards" supported the court's determination that his testimony was unreliable); *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 454 (8th Cir. 2008) (considering important to a reliability determination the fact the expert opinion "[took] the relevant ANSI standards into account").

**B.    Fronapfel's "building code" opinions should be excluded under Rule 403.**

Rule 403 provides additional grounds for excluding the above-referenced code-related opinions. As explained, Fronapfel's opinions are unreliable because he fails to cite to any particular "building code," and his analysis failed to consider the operative code—the IEBC. They are also irrelevant because Fronapfel does not provide any explanation of how such code

---

[6] For example, as it relates to repairs, Chapter 4 of the IEBC states:

**401.2. Compliance.** The work shall not make the building <u>less complying</u> than it was before the repair was undertaken.

(The IEBC can be viewed online at: https://codes.iccsafe.org/content/IEBC2021P2/chapter-4-repairs#IEBC2021P2_Ch04_Sec401).

upgrades are necessitated by the hail-related roof repairs; rather, he makes conclusory/*ipse dixit* statements such as, "Discovery of these conditions requires repair as there is a potential life-safety condition that has been exposed." (Ex. 2, August 2020 SBSA Report at 97.) Moreover, according to SBSA, the alleged non-compliant conditions, e.g., the ventilation, were not compliant with the building code prior to the hailstorm. (*See* Ex. 6, Klein Dep. Tr. 117:24-118:7; Ex. 4, Fronapfel Dep. Tr. 234:21-25.)  Therefore, such items should have been repaired during the 2012-2013 roof replacement project.

However, even assuming Fronapfel's code opinions possess an iota of probative value, any such value is substantially outweighed by the dangers of unfair prejudice, confusing the issues and misleading the jury. Fed. R. Evid. 403. In addition to the confusion that Fronapfel's vague references to "building code" would undoubtedly cause, his opinions would tend to sidetrack the jury into consideration of irrelevant issues. This is because the Policy's Ordinance or Law coverage only applies where damage to the building results in "enforcement" of the minimum requirements of the ordinance or law. (Ex. 7, Policy, ¶ IX.2., at 100.) There is no evidence here of any such enforcement. It also explicitly excludes any loss due to any ordinance or law that Plaintiff was required, yet failed, to comply with before the loss, even if the building was undamaged. (*Id.*, ¶ IX.6., at 101.) And the Policy further states that American Family will not pay for increased cost of construction "until the property is actually repaired or replaced" and "unless the repairs or replacement are made <u>as soon as reasonably possible</u> after the loss or damage, not to exceed two years." (*Id.*, ¶ IX.5.B.(3), at 101 (emphasis added).) As the Policy does not provide coverage for the alleged "code-required" upgrades, the presentation of evidence respecting such repairs by Fronapfel, an engineer, runs the substantial risk of confusing the

15

issues and misleading the jury. To the extent that any damages were to be awarded based on the estimated costs for the alleged code upgrades, such an award would be erroneous as a matter of law.

An additional factor to consider is Fronapfel's financial incentive to inflate the amount of claimed damages. *See City & Cnty. of Denver, Colo. v. Bd. of Assessment of the State of Colo.*, 947 P.2d 1373, 1379 (Colo. 1997) ("[A]n expert witness whose fee is contingent upon the outcome is improperly motivated and can not objectively inform the court on an issue about which the court needs additional instruction.") As set forth above, Fronapfel's company stands to gain a considerable percentage of the purported repair costs. (*See* RE Estimate, ECF No. 162-9, at 7.) Thus, by increasing the scope and cost of repairs, Fronapfel increases the amount his company is paid. This further militates, under the totality of the circumstances presented here, in favor of excluding his testimony. *See Wheatridge Office, LLC v. Auto-Owners Ins. Co.*, 578 F.Supp.3d 1187, 1210 (D. Colo. 2022) (excluding a public adjuster's expert testimony because his financial interest would undermine the strict and unyielding impartiality expected of expert witnesses); *Midtown Invs., LP v. Auto-Owners Ins. Co.*, 20-CV-01594-PAB-STV, 2022 WL 17039225, at *6 (D. Colo. Nov. 17, 2022) (holding that an expert's opinion testimony, "given his financial interest in the outcome of litigation, presents a danger of unfair prejudice to [defendant] that substantially outweighs its probative value").

Accordingly, under both Rule 702 and Rule 403, Fronapfel should be precluded from proffering any testimony that systems and components of the property are required to be brought into compliance with the current building code.

## CONCLUSION

For the above reasons, the Court should exclude the foregoing opinions of Edward

Fronapfel.

Dated:  February 2, 2023                    Respectfully submitted,


                                            *s/ Terence M. Ridley*
                                            Terence M. Ridley
                                            Dean Neuwirth
                                            William M. Brophy
                                            Spencer Fane LLP
                                            1700 Lincoln Street, Suite 2000
                                            Denver, CO  80203
                                            Telephone:   303.839.3800
                                            Facsimile:    303.839.3838
                                            Email:   tridley@spencerfane.com
                                                     dneuwirth@spencerfane.com
                                                     wbrophy@spencerfane.com

                                            Habib Nasrullah
                                            Wheeler Trigg O'Donnell LLP
                                            370 Seventeenth Street, Suite 4500
                                            Denver, CO  80202
                                            Telephone:   303.244.1800
                                            Facsimile:    303.244.1879
                                            Email: nasrullah@wtotrial.com


                                            Attorneys for Defendant
                                            American Family Mutual Insurance Company

## CERTIFICATE OF COMPLIANCE WITH THE COURT'S TYPE-VOLUME LIMITATIONS

        I hereby certify that the foregoing pleading complies with the proportionally spaced serif font requirement (here, Times New Roman).

        I further certify that this motion complies with Judge Domenico's Order (ECF No. 222) in that this motion contains 4,587 words (including footnotes but excluding the caption, signature block, certificate of service below, and this certificate of compliance) and that this motion is no more than 5,500 words.


        *s/ Terence M. Ridley*

## CERTIFICATE OF SERVICE (CM/ECF)

I HEREBY CERTIFY that on February 2, 2023, I electronically filed the foregoing **DEFENDANT AMERICAN FAMILY MUTUAL INSURANCE COMPANY'S MOTION TO EXCLUDE CERTAIN EXPERT OPINIONS OF EDWARD FRONAPFEL PURSUANT TO FED. R. EVID. 702 AND 403** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

- **William Michael Brophy**
  wbrophy@spencerfane.com, mlopez@spencerfane.com

- **Christopher N. Mammel**
  cmammel@merlinlawgroup.com, tchensee@merlinlawgroup.com,
  vquitugua@merlinlawgroup.com

- **Dean Steven Neuwirth**
  dneuwirth@spencerfane.com, tkane@spencerfane.com

- **Habib Nasrullah**
  nasrullah@wtotrial.com, goodwin@wtotrial.com, winiarski@wtotrial.com

- **Terence M. Ridley**
  tridley@spencerfane.com, lnorris@spencerfane.com, sallen@spencerfane.com

- **Michael William Duffy**
  mduffy@merlinlawgroup.com, ileservice@merlinlawgroup.com

- **Edward Eshoo, Jr.**
  eeshoo@merlinlawgroup.com, ileservice@merlinlawgroup.com

*s/ Terence M. Ridley*

Terence M. Ridley
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO  80203
Telephone:  303.839.3800
Facsimile:  303.839.3838
Email: tridley@spencerfane.com

Attorney for Defendant
American Family Mutual Insurance Company