IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-00683-DDD-STV

CANYON CLUB CONDOMINIUM OWNERS
ASSOCIATION,

        Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE
COMPANY, a corporation,

        Defendant.

---

**CANYON CLUB'S RESPONSE TO MOTION
TO EXCLUDE CERTAIN EXPERT OPINIONS OF EDWARD FRONAPFEL
PURSUANT TO FED. R. EVID. 702 AND 403 (ECF 223)**

---

Plaintiff Canyon Club Condominium Owners Association ("Canyon Club"), by its

undersigned counsel of record, submits this Response to American Family Mutual Insurance

Company's ("American Family") Motion to Exclude Certain Expert Opinions of Edward

Fronapfel Pursuant to Fed. R. Evid. 702 and 403 (ECF 223).

**I. Summary of Issues for Response**

Mr. Fronapfel's opinions developed through the documented and disclosed objective

investigation he conducted between 2016 and August 2021 are criticized as mere *ipse dixit* and

without apparent methodology. His Report shows otherwise; his methodology of objective

observations through investigation over an extended period of time is described, is a recognized

methodology under industry standards, and is apparent from the Report. Under the

circumstances, no other methodology could be used to determine the physical conditions of

damage to the exteriors of these buildings. *See, e.g.,* ECF 223-3 at 12-14.

The Motion only challenges the opinions disclosed in Fronapfel's August 26, 2020 Report (ECF 223-2), though he also disclosed another "supplemental" report on September 21, 2021 pursuant to this Court's Order authorizing supplemental case-in-chief opinions. ECF 138, ¶¶ 11-12; and 140. American Family itself sought leave to conduct this additional intrusive investigation so that both parties' experts could conduct further investigation on whether moisture was intruding through hail-caused fractures into the buildings. *See* ECF 96, 102, 104, 105, 106, 110, 113, 120, 134.[1] The parties' Joint Motion for supplementation of case-in-chief reports explicitly states:

> 12. In light of this, both parties believe that they need to supplement their case in chief reports in the fields of engineering and architecture, and potentially disclose additional experts who conduct this testing. The experts who will likely supplement their reports are primarily: (i) Edward Fronapfel, P.E. for the Plaintiff; (ii) any testing experts for the Plaintiff; (iii) Paul Logan and Mr. Koontz' replacement witness for American Family; and (iv) any testing experts for American Family.

ECF 138, ¶12. The Court explicitly authorized supplemental reports in its Order. ECF 140. Thus, Mr. Fronapfel's September 21, 2021 Supplemental Report, which analyzes the intrusive testing by the parties' experts and explicitly demonstrates "pathways" for water intrusion through hail-damaged shingles, is a part of his case-in-chief opinions that cannot be artificially ignored. Indeed, as a result of that supplemental investigation, even American Family's own expert, architect Paul Logan, was forced to acknowledge pathways into the building attic spaces through hail-fractured shingles on the ridges of the buildings. *See* Composite Ex. 1 (Logan Dep. at 216-77 and Ex. 348).

American Family also fails to acknowledge the full content of the August 2020 Report, which in itself undermines its Motion. Mr. Fronapfel's methodology in conducting the forensic

---

[1] Notably, while SBSA prepared a supplemental report augmenting its case-in-chief opinions for disclosure on September 21, 2021, American Family's expert, Paul Logan, purported to discuss some of the same intrusive testing results but disclosed a report with that supplemental information characterized as a "rebuttal" report.

investigation, including using direct objective observations of conditions and differential analysis on critical issues,[2] is fully disclosed. Mr. Fronapfel's report also discloses his reliance on the information developed during the extensive Building 14 restoration project (recharacterized as "Project X" in the Motion), which revealed substantial evidence of water intrusion patterns and pathways through the hail-damaged shingles on that roof – yet that part of his Report is not even mentioned in the Motion.

American Family's effort to suggest some financial motivation that might corrupt the integrity of Mr. Fronapfel's investigation is unfounded and should be disregarded. At best, it presents an argument that SBSA *could earn* engineering fees *if* it were ultimately selected to remain the project engineer during restoration of the buildings, *assuming* Canyon Club obtains a judgment encompassing all benefits claimed under the policy at the conclusion of this case. Even accepting those assumptions, Mr. Fronapfel would not benefit from that engagement since SBSA is owned by Charles Taylor, a large multi-national engineering company serving the insurance industry.[3] *See* Ex. 2 (excerpts of Fronapfel deposition at 179:5-181:182:2.). Moreover, SBSA identifies a potential 9% amount for engineering and owner's representation fees as a budget item, so the owner knows to expect such fees regardless of the engineer finally selected. ECF 223-2 at 107; *see also* Ex. 3 at 84-85. American Family's counsel is free to cross-examine Mr. Fronapfel on these topics during trial to persuade a jury that Mr. Fronapfel has joined the massive fraud conspiracy alleged against Canyon Club and literally every professional retained

---

[2] All of the SBSA Reports follow the ASCE Guideline for Condition Assessment of the Building Envelope, ASCE Standard 30-14, which provides a guideline and methodology for assessing the condition and performance of existing building envelope systems and components, as well as identifying problematic and dysfunctional elements. Ex. 4; *see generally* https://sp360.asce.org/PersonifyEbusiness/Merchandise/Product-Details/productId/200744690?_ga=2.198975657.780140534.1678805078-1717353244.1678805078.
[3] https://www.charlestaylor.com/en/news/news-post/acquisition-sbsa

in this case. Indeed, the majority of its arguments in this Motion are simply potential subjects for cross-examination. The Motion is baseless and should be denied.

## II. Procedural and Factual Background of the Motion

This case was filed after American Family ceased adjusting the hail loss claim made by Canyon Club and shifted the burden of investigating and quantifying the loss to its insured. In response to the proof of loss submitted by Canyon Club, American Family hired an architect and general contractor, but directed that they could not include in their estimates certain construction costs that would certainly have to be incurred in the repairs of the damages, and would be quite costly. *See generally* ECF 162 and 176. Even with those artificial constraints, the architect and general contractor determined that the initial estimates by American Family had omitted substantial restoration costs, and as a result American Family roughly doubled its prior payment. But since it refused to consider all costs that would be required to restore the damages, the payment was still far short. This suit was filed in state court January 30, 2018.

The estimates submitted on behalf of Canyon Club in support of its Proof of Loss have been vigorously disputed by American Family, and are claimed to be fraudulent. *See, e.g.*, ECF 40; 62, ¶¶ 95-254 and First through Fifth Counterclaims; ECF 89. American Family's Counterclaims allege that Canyon Club's breaches of the contract should result in forfeiture of additional benefits and return of the amounts American Family has already paid to Canyon Club as undisputed benefits.

To manage the uncertainty these litigation tactics created, placing all money previously paid at risk of return, Canyon Club decided to repair one of its buildings, Building 14, using its own funds (the "Building 14 Project"). The repairs were needed because water was intruding through the hail-damaged roof not only into attic spaces, but eventually into a unit interior. That

4

choice was provident – American Family's computer estimates attributable to Building 14

initially totaled $24,959.77 ("RCV") and later increased to $51,438.37 (RCV) using the

manipulated general contractor's estimate; Canyon Club's computer estimate set RCV at

approximately $186,500. The Building 14 Project revealed that the computer estimates of repair

costs prepared by American Family were materially deficient compared to the true cost of

restoration, approximately $523,200. The insurance policy insures the actual costs of

replacement, and proceeding in this lawsuit relying on the computer estimates of the amounts

owed would have been disastrous to the homeowners of this Association.

Following restoration of Building 14, SBSA submitted its initial litigation expert report

dated August 26, 2020 (the "2020 Report"). That report used observations of roof conditions

from the preliminary investigation SBSA conducted during adjusting in early 2017, along with

information gathered from extensive additional investigations, the Building 14 Project, and

supplemental investigations after that Project. *See* ECF 223-2 at pp. 1, 3-6, 20-26, 37-58, 73-76,

78-99. In efforts to limit Canyon Club's recoverable damages (*see* ECF 96, 102, 104, 105, 106,

110, 113, and 134), American Family sought more time to investigate the opinions in the 2020

Report identifying moisture intrusion through hail-damaged shingles as additional damage,

claiming that it was surprised about such damage. In fact, American Family's own investigation

in 2017 had identified penetrating hail-caused fractures through shingles and interior moisture

damage. *See* ECF 113-1 and 113-2 ("Many of the ridge cap shingles sealed had hail fractures

through the matting." 12/7/17 Claim Log note by adjuster). Ultimately, American Family was

allowed to undertake additional intrusive testing on a number of building roof systems, which led

to the need for supplementation of the case-in-chief reports served by each party on August 31,

2020. *See* ECF 106, 110, 113, 120, 134, 138, 140.

**II. SBSA's 2020 Report and 2021 Supplemental Report
Disclose Reliable Methodology**

**A. SBSA's Methodology Conforms to ASCE Standard 30-14
for Condition Assessment of the Building Envelope**

The overarching purpose of the Court's inquiry is "to make certain that the expert ...

employs in the courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field." *Goebel v. Denver and Rio Grand Western Railroad Co.*, 346 F.3d

987, 992 (10th Cir. 2003) (quoting *Kumho Tire*, 119 S.Ct. at 1176). Generally, "rejection of

expert testimony is the exception rather than the rule." *United States v. Nacchio*, 519 F.3d 1140,

1154 (10th Cir. 2008), *vacated in part on rehearing en banc*, 555 F.3d 1234 (10th Cir. 2009).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence." *Daubert*, 113 S.Ct. at 2798.

Expert opinions must have "a traceable, analytical basis in objective fact." *Bragdon v.

Abbott*, 524 U.S. 624, 653, 118 S.Ct. 2196, 2212, 141 L.Ed.2d 540 (1998). "The requirement that

an opinion be derived from reliable principles or methods, known colloquially as

"methodology," involves two related inquiries: (i) what methodology did the witness use to reach

the opinion; and (ii) is that methodology generally deemed 'reliable' in the field in which the

expert works. Both inquiries are entirely factual in nature, and the proponent of the opinion must

establish both inquiries by sufficient, competent evidence." *U.S. v. Crabbe*, 556 F.Supp.2d 1217,

1222 (D. Colo. 2008).

SBSA's Reports disclose objective observations of site conditions and photographs of

building conditions as the methodology guiding its assessment of building conditions. This

methodology is generally accepted for engineering investigations to assess building conditions

6

and is specified by the ASCE Standard 30-14 for Condition Assessment of the Building

Envelope. *See* Ex. 4 ("ASCE Guidelines"). The 2020 Report, and all others, follow the

observation methodology and reporting standards of the ASCE Guidelines. *Id.*, §§ 3, 4 and 5,

including discussions of the purpose and scope of the investigation. The 2020 Report states:

**PURPOSE AND SCOPE**

> The purpose of SBSA's observations and analysis was to perform the following regarding the Canyon Club site located in Denver, Colorado:
>
> A. Determine to within a reasonable degree of engineering certainty the scope of damages manifesting on the roof coverings, exterior wall claddings, and site appurtenances as a result of the July 15, 2016 hail event.
>
> B. Provide recommendations to correct the hail-caused damages to the roof systems and assemblies, exterior wall claddings, and site appurtenances.

ECF 223-2 at pp. 1-3. The Report lists 41 dates and purposes of direct building observations by

SBSA's staff at the Canyon Club site. *Id.*, pp. 3-5. The Report describes generally the objective

assessment methodology followed:

> All work performed was under the responsible charge of Edward L. Fronapfel, MSCE, PE. This work consisted of surveying and recording on-site, as-built conditions that are objective in nature. These findings were recorded and transcribed in this report and the attached documents. If necessary, all individuals listed above will testify to the accuracy and objective criteria used for the evaluation of this site. The intrusive testing and repairs to Building 15 (14) were conducted with engineers representing the insurance company on-site during the examinations. It is our understanding that the defense has had the opportunity to inspect the property in addition to SBSA's work.

*Id.* at p. 5. On p. 6, the Report lists "Project Documentation Reviewed," and on pp. 20-76 the

Report contains a textual description of the objective observations carried out by SBSA from the

"end of 2016 through 2020," including intrusive testing, with representative captioned photos. *Id.*

On pp. 41-101, the objective observations made during the Building 14 Restoration Project are

stated, with representative captioned photos. After reporting of those observations, Fronapfel's

7

opinions are stated, and thereafter recommendations for repairs to all the hail-damaged systems are made. This methodology conforms closely to the ASCE Guidelines for a "detailed condition assessment," and coupled with the opportunity to observe and note conditions revealed during the intrusive restoration performed on Building 14, incorporates observations from extensive destructive testing to reveal evidence and sources of moisture intrusion, and as built conditions important for purposes of the General Recommendations for Repair stated in the Report starting at p. 103.

Objective observation of building conditions is the methodology applicable to an investigation of buildings conditions, and the 2020 Report exhibits in detail the methodical process "by which [Mr. Fronapfel] *relates* his experience to the facts at hand in order to reach an expert opinion." *Dean v. Thermwood Corp.*, *supra* at *7 (emphasis added).

### B. The Supplemental Report dated September 21, 2021 Also Conforms to the ASCE Guidelines

Although ignored by the Motion, the Court authorized both parties to supplement their experts' case-in-chief opinions by September 21, 2021. *See* ECF 138. In its Order granting the parties' Joint Motion, the Court ordered:

> ORDER granting [138] Motion to Amend Scheduling Order. Expert deadline for supplementation for testing and rebuttal deadline (for experts uninvolved in testing) set for 9/21/2021. Limited rebuttal deadline for experts involved in testing set for 10/19/2021. Fact and Expert Discovery due by 11/2/2021. Dispositive Motions due by 12/21/2021. Rule 702 Motions due by 2/1/2022. SO ORDERED, by Magistrate Judge Scott T. Varholak on 7/9/2021. Text Only Entry(stvlc2, )

ECF 140 (emphasis added). Consequently, both of SBSA's Reports reflect case-in-chief opinions and must be evaluated in combination. The September 21, 2021 Report by SBSA ("2021 Supplemental Report") also followed closely the methodology and report formatting specified in the ASCE Guidelines. *See* Ex. 5. The Purpose and Scope of the 2021 Supplemental Report is

identical to the 2020 Report, but it noted seven additional dates of site inspections and

observations after May 12, 2020 through June 10, 2021 while American Family was conducting

its intrusive testing, and identified additional shingle desaturation testing by Roof Leak Detection

Company and evaluation of "Photographs, Videos, and Documentation obtained and/or produced

from/by Impact Claim Services, LLC, received June 2021." *Id.* at p. 5. The 2021 Supplemental

Report described SBSA's supplemental Observations:

> As a result of the hailstorm on July 15, 2016, the roof coverings at the Canyon Club
> site were temporarily repaired in December 2017 using sealant at identifiable
> locations of damage to help mitigate any additional water intrusion from occurring. In
> January 2020, additional repairs were performed. The selected areas of the roof
> coverings for intrusive testing generally had locations of sealant present.
>
> SBSA observed the intrusive cuts that were performed under the direction of Paul
> Logan, Jim Koontz, and others who were contracted by American Family Mutual
> Insurance. Additionally, Canyon Club Homeowners Association (HOA) performed its
> own intrusive testing facilitated by Derek O'Driscoll of Impact Claim Services, LLC
> (ICS). The intrusive testing was observed and/or reviewed by SBSA.
>
> The intrusive cuts by American Family's contractors generally involved removal of
> ridge cap shingles, ridge vents, field shingles, and decking to provide access to the
> attics.
>
> SBSA's observations found that the plastic ridge vents had visible staining, consistent
> with water intrusion through the shingles, correlating to locations of sealant on the
> above shingles. The center area of the ridge vent had perforations to allow it to bend,
> which also provides openings in the plastic which are more susceptible to water
> intrusion. The method of attachment of the ridge vent involves nailing through the
> shingles, through the ridge vent, and into the framing/sheathing below. These nail
> penetrations are also susceptible locations for water intrusion.
>
> Under the plastic portion of the ridge vent, a membrane material is installed which is
> advertised to be suitable as a "StormStop®" such that the manufacturer states water
> cannot penetrate through the membrane. The membrane had visible staining
> consistent with water intrusion when observed from beneath in the attic or when
> pulled back from on the roof. Where access into the attic was provided, it was noted
> that the framing members and moisture-sensitive building materials directly below
> the ridge vents occasionally had water stains indicative of a drip or consistent water
> source leaking from the ridge vent. The attic access was limited and the insulation
> generally obscured the ability to view the framing members.

> The ridge vent is not always continuous at locations of intrusive examination. The splice or joint in the ridge vent creates an opening directly into the attic and in some locations was 1/4-inch wide.
>
> During the observations, SBSA also noted locations on the shingles that were not sealed and had circular concentrated granule loss consistent with damages expected from the impact of hailstones. Where the shingles did have sealant over anomalies on the top side of the shingle, the underside of the shingle had visible and palpable deformation and occasionally a tear or fracture consistent with damages expected from hailstones. The locations of sealed anomalies were noted to correlate with locations of water staining on the top of the ridge vent.

*Id.* at pp. 5-6. Numerous captioned photos of the observed conditions are included in the 2021

Supplemental Report clearly depicting the results of the observation methodology, followed by

an "Analysis" section to present findings from the extensive additional observations made,

explicitly describing "pathways" for moisture to enter into the building attics through the

observed hail penetrations. *Id.* at pp. 7-21. The Report narrative continues to then describe

observations made from desaturation test results of the shingles sent for testing to Roof Leak

Detection:

> ICS [Impact Claim Services] retained some of the shingles and ridge vents from the Canyon Club site during the intrusive testing, which was performed on behalf of American Family Mutual Insurance Company by Architectural Alliance Group as well as the additional testing performed on behalf of Canyon Club HOA. This evidence was provided to SBSA for observation and photography, after which SBSA sent it to Roof Leak Detection Company (RLDC) for them to perform a desaturation analysis on the shingles. Desaturation involves removing the bituminous coating from a sample of asphaltic roofing material using a chemical solvent so that the reinforcing layers can be subsequently analyzed. RLDC identified the rough outline of each sample and location of each indentation, sealant, and/or suspicious damaged location(s) on one transparent plastic sheet per sample. After desaturation, the transparent sheet was placed to match up with the sample and indicate the location of suspicion.
>
> Of the 30 samples sent to RLDC, 25 of the shingles had bruising consistent with the impact of hailstones and 11 of the samples had fractures in the reinforcement layer consistent with the impact of hailstones. Two of the samples had bruising and fracturing at both of the impact areas identified on the shingles. The desaturation was performed on three field shingles and 27 ridge cap shingles.

10

> RLDC utilizes the definition provided by Haag Engineering to describe bruising of shingles. They define bruising as *"rupture of the reinforcing mat involves either bruising, which can be felt as a soft spot on the shingle (much like an apple bruise) or puncturing where there is a hole in the mat. Bruises are soft areas large enough to be detected by finger pressure and generally are accompanied by a sufficient loss of granules within the impact area to expose the underlying bitumen."* RLDC identified bruises on the shingles prior to desaturation. After the desaturation process, this bruising was identified on the reinforcement by locations with discoloration. Fractures in the reinforcement were observed after desaturation as holes or broken reinforcement fibers.
>
> The process of desaturation allows for visible observation of damage to the shingle that is not observable to the naked eye when the shingle has all of its layers of bitumen and granule surfacing. The analysis performed by RLDC reveals that of the 30 shingle samples that were sent, the majority had damage consistent with that expected from the impact of hailstones.

*Id.* at p. 22-23 (emphasis in original). Representative desaturation testing photographs observed by SBSA were included in the Report. *Id.* at pp. 23-27. After these objective observations are disclosed, Conclusions were stated:

> Based on the supplemental observations occurring after the issuance of the SBSA Observation Report on August 26, 2020, review of the ICS-provided information, and the additional American Family reports and work, it has been determined to within a reasonable degree of engineering certainty that water has intruded through the hail-caused fractures in the shingles and has resulted in staining on the ridge vents and on the underside ridge vent membrane, and water migration within the rafters and attic. The desaturation analysis further revealed that the shingles are bruised and/or fractured through the reinforcement layer, and further provided evidence that the 2016 hail event damaged the roofing assemblies and resulted in further damages to the roofing assembly beyond the roof covering itself.

*Id.* at p. 27, *see also* Ex. 3 at 53. The Supplemental Report attaches hundreds of the observation photographs evaluated by SBSA so its methodology and conclusions could be verified. Ex. 5 at p. 29-586.

> As provided in the ASCE Guidelines:
>
> *Commentary* – Conclusions and recommendations are based upon the survey, investigation, testing, and evaluation. These steps require experience and professional judgment. As such, they are not considered to be part of the standard, although they are the most important part of the report.

Ex. 4 at p. 26, § 5.11. The methodology for observation and reporting specified in the ASCE

Guidelines expressly anticipated that the engineer's "experience and professional judgment" will

be applied to the information observed to make the condition assessment. In light of the

voluminous record of building condition observations made by SBSA and Fronapfel, bringing

Fronapfel's "experience and professional judgment" to bear on that information is part of the

methodology used in the industry, and is in no sense simply his "*ipse dixit*" conclusion.

Based on several of the same photographs taken by ICS showing the conditions revealed

by American Family's intrusive testing in 2021, American Family's causation expert, Paul

Logan, admitted the potential for intrusion of water through the hail-caused penetrations in

shingles he had personally selected to remove and examine. Mr. Logan's testimony was based on

the common methodology of observing building conditions and using his "experience and

professional judgment" to reach conclusions. *See* Ex. 1.

### C. Fronapfel Relied on the Disclosed Observations to Reach his Conclusions and Recommendations for Repair

The Motion incorrectly asserts that Mr. Fronapfel "jumped" to his conclusions in the

2020 Report based on nothing other than an observation of one unit resident, Angela Becker. She

observed water damage that actually became visible in the interior of her unit in early February

2017, after the 2016 hail storm. ECF 223 at 8, 9. Clearly, though, the 2020 Report shows that

Mr. Fronapfel's observations included hundreds of building conditions through and including the

Building 14 Project, along with the coincidence of water intrusion in Ms. Becker's unit. *See* ECG

223-2 at pp. 20-39.

The Motion also criticizes Mr. Fronapfel for failing to have personally interviewed Ms.

Becker. Yet, Mr. Fronapfel relied on exactly the same information American Family had from

her about when she had noticed leaking – he had her deposition transcript, and relied on her

sworn testimony. *Id.* at 39-40. Use of a sworn interview of a building occupant was appropriate

methodology according to ASCE Guidelines (*see* Ex. 4, § 3.4.3 at p. 17).[4]

Fronapfel did not, as the Motion accuses, simply "extrapolate" based on only the limited

information Ms. Becker provided about her unit to all of the other 175 units in the complex. *See*

ECF 223-2 at pp. 20-101. In the Repair Recommendations, Mr. Fronapfel states:

> The intent of the following is that all repairs will be provided in whole. It will be
> necessary for qualified design professionals to perform additional work to prepare
> proper construction documents, details, calculations, and specifications suitable for
> construction of the repairs described herein.

*Id.* at 103. SBSA had prepared construction documents for the restoration of Building 14,

personally stamped with Fronapfel's engineering seal, and its investigation of the other buildings

led to preparation of other design specifications where buildings varied from the construction of

Building 14. *See id.* at p. 106.

### D. Fronapfel Identified Denver Building Codes in his Reports in the Same Manner that Information is Presented to the City and County of Denver for Building Permits

American Family argues that Mr. Fronapfel's opinions that applicable Denver Building

Codes must be complied with in the restoration of the buildings, do not exhibit the "methodology

or reasoning" for the necessity of those "code-related" repairs. ECF 223 at 13. The Motion

argues that Fronapfel's omission of reference to the International Existing Building Code

("IEBC") is indicative of the flaws in his methodology. Mr. Fronapfel stated in his deposition

that the IEBC was not referred to in his Reports, but that he had specifically discussed that Code

---

[4] The Motion also asserts that Mr. Fronapfel's conclusions are not based on sound methodology because he did not personally review the testimony of former maintenance manager Adam Blake. ECF 223 at 11. Review of excerpts of Blake's testimony shows that most of his testimony was based on hearsay information from memories of possible events before his employment. He testified he had never witnessed an "active leak." ECF 223-5 at 3. One verified leak into a unit was stated to have been the result of improperly discharging a dryer into an attic, which the owners were instructed to remedy. *Id.* at 5. This "historical" information is at best unhelpful, but American Family may cross-examine Mr. Fronapfel about that.

in a rebuttal report. ECF 223-4 at 14. In fact, the IEBC specifically refers construction

professionals to *other* Denver building codes. The International Code Council, Inc. (ICC),

"International Existing Building Code (IEBC)," 2018, Chapter 7 "Alterations – Level 1," Section

705 "Reroofing," states the following:

> 705.1 General. Materials and methods of application used for recovering or replacing
> an existing roof covering shall comply with the requirements of Chapter 15 of the
> <u>International Building Code</u>. (Emphasis added).

 The IEBC does not apply to this reroofing work at all, and Mr. Fronapfel references all the

pertinent code provisions in his rebuttal to Mr. Logan's criticisms. Ex. 3 at 1-2, 8-15, 56-59, 66-

85.[5] Mr. Fronapfel did not "fail" to consider the IEBC in the "reroofing" project – he considered

it and correctly concluded it is not applicable.

SBSA and Mr. Fronapfel submitted engineering specifications and plans for restoration

of Building 14 as the project engineers of record. *See* Ex. 6.

## CODE ANALYSIS & REQUIREMENTS

### ORIGINAL CONSTRUCTION
APPLICABLE CODE:
1965 UNIFORM BUILDING CODE WITH DENVER BUILDING CODE AMENDMENTS
1965 CITY AND COUNTY OF DENVER BUILDING CODE: VOLUME 1, ORDINANCE NO. 1 - SERIES OF 1965

### NEW CONSTRUCTION
APPLICABLE CODE:
2015 INTERNATIONAL RESIDENTIAL CODE (IRC)
2015 INTERNATIONAL BUILDING CODE (IBC)
2018 CITY AND COUNTY OF DENVER AMENDMENTS

| Ground Snow Load (psf) | Wind Design | | | | Seismic Design Category | Subject to Damage From | | | Winter Design Temp (degrees) | Ice Barrier Under-layment Required | Flood Hazard | Air Freezing Index | Mean Annual Temp (degrees) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Speed (MPH) | Topo-graphic Effects | Special Wind Region | Wind-borne Debris Zone | | Weathering | Frost | Termite | | | | | |
| 35 | 115/125/140 | No | Yes | No | B | Severe | 36" | Slight/Mod | 1° C | No | 1978 | 712 | 40-45° F |

---

[5] SBSA's October 19, 2021 Rebuttal Report addresses the September 21, 2021 "Rebuttal Report" prepared by American Family's expert, Mr. Logan, criticizing the 2020 Report by Mr. Fronapfel. Logan's September 21, 2021 "Rebuttal Report" was actually a supplemental case-in-chief report discussing the 2021 intrusive testing requested by American Family. *See* ECF 138 and 140.

*Id.* at p. 1; *see also id.*, General Notes, § B at p. 2. These design plans are submitted under Mr. Fronapfel's seal as a "Registered Professional Engineer," and no greater specificity in referring to building codes is required – SBSA has employed for its litigation reports "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Goebel v. Denver and Rio Grand Western Railroad Co.*, *supra* at 992 (quoting *Kumho Tire*, 119 S.Ct. at 1176).

Additionally, the Denver Building Code specifically requires that construction professionals design and build to protect life safety. *See* Ex. 7, 2019 Denver Building and Fire Code, ch. 1, §§ 101.2 and 103.5. And, fundamental to the obligations of engineers (and architects, such as American Family's expert) is that they must address issues in the course of repairs that create "a danger to life, health, property, and welfare of the public." *See* C.R.S. § 12-120-201; 4 CCR 730-2.2; 3.1.4; and 3.1.8. Engineers may approve and seal only documents that "provide safety for public health, property, and welfare in conformity with generally accepted architectural, engineering, and surveying standards." 3 CCR § 3.1.4. As a registered professional engineer in Colorado, Mr. Fronapfel was obligated to make such judgments based on his condition observations, and design the construction using those safe practices and structures.

### E. The Balancing Test Under Fed.R.Evid. 403 Weighs Decisively in Favor of Allowing Mr. Fronapfel's Opinions That the Restoration Construction Must Comply with Applicable Building Codes and Standards

Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "The district court has considerable discretion in performing the Rule 403 balancing test," but "exclusion of evidence under Rule 403 that is

15

otherwise admissible under the other rules 'is an extraordinary remedy and should be used sparingly.' " *United States v. Tan*, 254 F.3d 1204, 1211 (10th Cir. 2001), quoting *United States v. Rodriguez*, 192 F.3d 946, 949 (10th Cir. 1999).

SBSA's 2020 Report and 2021 Supplemental Report are both prepared with "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Goebel v. Denver and Rio Grand Western Railroad Co.*, *supra* at 992. His Rebuttal Report to American Family's expert's criticisms that applicable building codes did not support the cost and need to repair the buildings fully addressed, and refuted, those assertions. *See* Ex. 3 at Ex. 3 at 1-2, 8-15, 56-59, 66-85.

American Family's assertion that Mr. Fronapfel should have applied the IEBC is simply wrong; that code directs to the other building codes cited in the building plans, the "2015 International Residential Code, the 2015 International Building Code, and the 2018 City and County of Denver Amendments." *See* IEBC 2018, Chapter 7 "Alterations – Level 1," Section 705; *see also* Ex. 3. Mr. Fronapfel's testimony in these regards will clarify for the jury what is apparently a confusing technical field. Colorado law, including the Denver Building Code, is clear that engineers are charged with using their training and judgment to avoid construction incorporating life safety hazards. Again, since such hazards cannot be exhaustively listed, Mr. Fronapfel's opinions in light of his factual observations of these structures and extensive training and experience (which is not challenged by American Family) will be helpful to a jury. *See* Ex. 8.

The reference in the Motion to American Family's contentions about Ordinance or Law coverage in the policy is not factual, and no dispositive motion was ever filed to limit or interpret such coverage. Under the policy, the Increased Cost of Construction due to Ordinance or Law is

16

*at least* $300,000 for *each* of the 41 buildings (*see* ECF 223-7 at p. 100 of 110 – Condominium Enhancement Endorsement, § IX), and there is no showing in the Motion that the costs of the alleged code compliance in the estimate will exceed the $12,300,000 coverage available. American Family's contentions about interpretation of the policy are not relevant to this Motion.

And while American Family implies that Mr. Fronapfel may receive a "contingency" fee once this case is resolved, and Canyon Club recovers sufficient policy benefits to pay for the full scope of repairs, and SBSA is hired as the design engineer and owner's representative, that implication is wholly false. At best, this contention is cross-examination, but realistically since American Family knows that Charles Taylor, a large multi-national corporation dominantly serving the insurance industry, owns SBSA, and the fees are merely based on a percentage of other construction costs (*see* Ex. 3 at 84-85), those remote potential fees support no inference of bias. *See* https://www.charlestaylor.com/en. No evidence in this record supports exclusion of any of Mr. Fronapfel's opinions under Rule 403.

## **CONCLUSION**

Canyon Club respectfully requests the Motion to Exclude Certain pinions of Edward Fronapfel Pursuant to Fed.R.Evid. 702 and 403 (ECF 223) be denied. There is no basis to exclude any testimony of Mr. Fronapfel under Rule 702, and the balancing test under Rule 403 weighs in favor of allowing his opinion testimony.

Respectfully submitted,

By: s/ Christopher N. Mammel
Christopher N. Mammel
Merlin Law Group, P.A.
1001 17th Street, Suite 1150
Denver, CO 80202
Telephone: (720) 665-9680
Facsimile: (720) 665-9681
Email: cmammel@merlinlawgroup.com

17

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1) and Order (ECF 222).

s/Christopher N. Mammel

**CERTIFICATE OF SERVICE (CM/ECF)**

I HEREBY CERTIFY that on March 16, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Terence M. Ridley, Esq.
Dean Neuwirth, Esq.
William M. Brophy, Esq.
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO  80203
Telephone:  303.839.3800
Facsimile:   303.839.3838
Email:  ridley@spencerfane.com; dneuwirth@spencerfane.com; and mbrophy@spencerfane.com

Habib Nasrullah, Esq.
Wheeler Trigg O'Donnell
370 17th Street, Suite 4500
Denver, CO 80202
Tel: 303.244.1960
Fax: 303.244.1879
Email: nasrullah@wtotrial.com

By: s/Tamara Chen-See
Tamara Chen-See

18